No. 17-1016

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ART+COM INNOVATIONPOOL GMBH,

*Plaintiff-Appellant,*

v.

GOOGLE INC.,

*Defendant-Appellee*

On Appeal from the United States District Court
for the District of Delaware
Case No. 1:14-cv-00217

## CORRECTED PRINCIPAL BRIEF OF GOOGLE INC.

Daryl L. Joseffer
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Ave, NW
Washington, DC  20006
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
djoseffer@kslaw.com
jmitchell@kslaw.com

*Counsel for Google Inc.*

Original:  March 13, 2017
Corrected:  March 30, 2017

# CERTIFICATE OF INTEREST

Counsel for Google Inc. certifies the following:

1. The full name of every party represented by me is Google Inc.

2. The name of the real party in interest is Google Inc.

3. Alphabet Inc., a publicly traded company (NASDAQ: GOOG, GOOGL), has more than 10% ownership of Google Inc. No publicly held company owns 10% or more of Alphabet Inc.'s stock.

4. The names of all firms and the partners or associates that appeared for the parties now represented by me in the trial court or that are expected to appear in this Court are:

   AKIN GUMP STRAUSS HAUER & FELD LLP: Ashraf A. Fawzy; Cono A. Carrano; David C. Vondle

   O'MELVENY & MYERS LLP: Darin W. Snyder; David S. Almeling; Brett Williamson; John X. Zhu; Luann L. Simmons; Mark Liang; Mishima Alam

   MORRIS, NICHOLS, ARSHT & TUNNELL LLP: Jack B. Blumenfeld; Paul Saindon

   KING & SPALDING LLP: Daryl L. Joseffer; Joshua N. Mitchell; Hon. Adam M. Conrad (no longer with the firm)

March 13, 2017                    /s/ Daryl L. Joseffer
                                 Daryl L. Joseffer

**TABLE OF CONTENTS**

CERTIFICATE OF INTEREST .................................................................. i

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF RELATED CASES ..................................................... vii

INTRODUCTION ..................................................................................... 1

COUNTERSTATEMENT OF THE ISSUES ............................................ 3

COUNTERSTATEMENT OF THE CASE ................................................ 4

    A.    Counterstatement of Facts ....................................................... 4

    B.    Procedural History ................................................................ 15

SUMMARY OF THE ARGUMENT ........................................................ 19

STANDARD OF REVIEW ...................................................................... 22

ARGUMENT ........................................................................................... 24

I.    Substantial Evidence Supports The Jury's Finding Of
Noninfringement. ........................................................................... 24

    A.    Art+Com Failed To Prove That Google's Products
Performed The "Storing" And "Representing"
Limitations Of Step (f). .......................................................... 24

    B.    Art+Com Failed To Prove That Google's Products
Perform Step (g). .................................................................... 30

    C.    Art+Com's Arguments Are Based On A Waived And
Incorrect Claim Construction. ................................................ 32

II.    Substantial Evidence Supports the Jury's Finding of
Invalidity. ....................................................................................... 34

    A.    The Asserted Claims Are Invalid Because SRI
TerraVision Anticipated Them. .............................................. 36

B.    The T_Vision Paper Anticipated Claims 1, 14, and 28. ....... 51

C.    The T_Vision Paper Plus The '319 Patent Rendered Claim 3 Obvious. .................................................................. 56

III.   Art+Com Does Not Merit Enhanced Damages. ............................ 58

CONCLUSION ........................................................................................ 62

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Agrizap Inc. v. Woodstream Corp.,*
 520 F.3d 1337 (Fed. Cir. 2008)............................................................23

*Arthrocare Corp. v. Smith & Nephew, Inc.,*
 406 F.3d 1365 (Fed. Cir. 2005)............................................................54

*Arthur A. Collins, Inc. v. N. Telecom Ltd.,*
 216 F.3d 1042 (Fed. Cir. 2000)............................................................26

*Atlanta Attachment Co. v. Leggett & Platt, Inc.,*
 516 F.3d 1361 (Fed. Cir. 2008)............................................................50

*Blue Calypso, LLC v. Groupon, Inc.,*
 815 F.3d 1331 (Fed. Cir. 2016)............................................................34

*Broadcom Corp. v. Emulex Corp.,*
 732 F.3d 1325 (Fed. Cir. 2013)............................................................29

*Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.,*
 725 F.3d 1341 (Fed. Cir. 2013)............................................................27

*Comark Commc'ns, Inc. v. Harris Corp.,*
 156 F.3d 1182 (Fed. Cir. 1998)............................................................40

*Cordance Corp. v. Amazon.com, Inc.,*
 658 F.3d 1330 (Fed. Cir. 2011)............................................................34

*Cordis Corp. v. Boston Sci. Corp.,*
 561 F.3d 1319 (Fed. Cir. 2009)............................................................32

*Delano Farms Co. v. Cal. Table Grape Comm'n,*
 778 F.3d 1243 (Fed. Cir. 2015)......................................................48, 49

*Dey, L.P. v. Sunovion Pharms., Inc.,*
 715 F.3d 1351 (Fed. Cir. 2013)......................................................48, 49

*Egbert v. Lippmann,*
 104 U.S. 333 (1881) .......................................................................18, 47

*Fireman's Fund Ins. Co. v. Videfreeze Corp.*,
  540 F.2d 1171 (3d Cir. 1976) ................................................. 29

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
  136 S. Ct. 1923 (2016) ....................................... 59, 60, 61

*Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*,
  726 F.3d 1370 (Fed. Cir. 2013) ......................................... 50

*In re Seagate Technology, LLC*,
  497 F.3d 1360 (Fed. Cir. 2007) ......................................... 59

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ............................................. 19, 57, 58

*Laborers Int'l Union of N. Am. v. Foster Wheeler Corp.*,
  26 F.3d 375 (3d Cir. 1994) ............................................... 32

*Lavender v. Kurn*,
  327 U.S. 645 (1946) ...................................................... 23, 41

*Malta v. Schulmerich Carillons, Inc.*,
  952 F.2d 1320 (Fed. Cir. 1991) ......................................... 35

*Medtronic Inc. v. Mirowski Family Ventures, LLC*,
  134 S. Ct. 843 (2014) ....................................................... 24

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002) ......................................... 23

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ......................................................... 33

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*,
  298 F.3d 1290 (Fed. Cir. 2002) ......................................... 51

*Pfaff v. Wells Elecs., Inc.*,
  525 U.S. 55 (1998) ........................................................... 50

*Sanofi–Synthelabo v. Apotex, Inc.*,
  550 F.3d 1075 (Fed. Cir. 2008) ......................................... 34

*Smithkline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006).............................................32

*Sun Tiger, Inc. v. Sci. Research Funding Grp.*,
189 F.3d 1327 (Fed. Cir. 1999).............................................23

*WesternGeco L.L.C. v. ION Geophys. Corp.*,
837 F.3d 1358 (Fed. Cir. 2016).............................................59

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006).............................................26

**Statutes**

35 U.S.C. § 102(b) (2006).........................................................13

**Other Authorities**

Birgit Millauer & Elspeth Simpson White,
*The § 102(b) Foreign Filing Catch*, Law360 (Jan. 8, 2009),
*available at* https://goo.gl/vvH28A.......................................57

# STATEMENT OF RELATED CASES

Google is not aware of any related cases.

# INTRODUCTION

The jury presumably found that the asserted patent claims did not infringe for multiple reasons and were invalid for multiple reasons. Art+Com could overturn the jury verdict only by showing that *none* of those bases for the verdict was supported by substantial evidence. It has not come close to doing so.

This case concerns two distinct methods for displaying geographic data—such as satellite images—to a user while the user navigates around a map or virtually moves over a three-dimensional landscape. Both methods involve retrieving the geographic data over a network so that the user does not have to store a massive database containing high-resolution images of the whole world on a local computer with limited storage capacity.

One method—that claimed in the asserted patent and previously disclosed in the prior art—emphasizes creating an orderly zooming effect across the entire field of view by iteratively retrieving and displaying images at progressively higher resolutions until a maximum resolution is reached. The other method, used by the accused Google Earth products, prioritizes speed and accordingly requests the highest-

resolution usable images first—skipping certain lower-resolution images. Because of this difference in operation, Art+Com did not and could not carry its burden of showing that Google's accused products infringed the asserted patent.

Google also demonstrated that the claimed invention was nothing new. SRI had developed TerraVision, a substantively identical technology, and demonstrated it at public conferences more than a year before the filing of the application for the asserted patent. Art+Com personnel were present at one of these demonstrations, and the SRI developer who designed and demonstrated the system even gave them a copy of the SRI TerraVision source code. At the same conference where Art+Com saw SRI TerraVision in action, Art+Com itself published a paper describing its later-patented invention—again more than a year before it filed its U.S. patent application.

Art+Com declined to rebut Google's invalidity case. After Google's case in chief, Art+Com put its expert back on the stand and asked him only one question—about infringement, not invalidity.

The jury gave Art+Com's meager case exactly as much consideration as it deserved, returning a unanimous verdict of

noninfringement and invalidity after about an hour's deliberation. The district court upheld the verdict in its entirety and entered judgment in Google's favor. Now, relying on waived arguments, conclusory statements without foundation, and what may charitably be described as highly selective citations to the record, Art+Com asks this Court to revise history. This Court should reject Art+Com's effort to rewrite the trial record and should affirm the judgment of the district court.

## COUNTERSTATEMENT OF THE ISSUES

1. Did the district court correctly conclude that substantial evidence supports the jury's verdict of noninfringement, when (i) the only evidence of infringement of the two key claim steps was a handful of conclusory answers by Art+Com's expert, (ii) that expert conceded that he had not done an infringement analysis on those claim steps, and (iii) Google demonstrated that the accused products do not perform those steps?

2. Did the district court correctly conclude that substantial evidence supports the jury's verdict of invalidity, when the jury heard testimony that, more than one year before the patent application, (i) an anticipating system was demonstrated at a public conference attended

by Art+Com and (ii) Art+Com also published a full description of the claimed invention?

3. Did the district court correctly determine that any infringement would not have been willful?

## COUNTERSTATEMENT OF THE CASE

### A. Counterstatement of Facts

***The Technology.*** The technology at issue in this case involves displaying pictorial geographic information—like satellite photographs of terrain—on a computer. A user may move the viewpoint from one location to another, or to zoom in or out from one level of detail to another. *See, e.g.*, Appx0353:10–15; Appx1030:4–7. High-detail, high-resolution images require large amounts of data. As a result, loading them consumes a large amount of network bandwidth, storing them requires a lot of memory, and displaying them taxes video hardware. The result is that high-resolution images can take longer to display than lower-resolution images, causing slow or choppy performance when a user moves from one view to another. *See, e.g.*, Appx0343:8–16.

This case involves two distinct methods for remedying that problem. Both methods store and display pictures of geographic areas at multiple resolution levels. For example, a system implementing

4

either method might store: images showing an entire state, in which a city is represented as a single pixel or a handful of pixels; images showing the city itself at an intermediate level of detail; and images showing very small areas, with details of small portions of individual streets and buildings within the city. *See, e.g.*, Appx1035:23–1036:12.

Both methods first display geographic images at a low resolution, letting a user quickly move the viewpoint around a large area, or zoom in or out, without straining hardware resources. *See* Appx1018–1019; Appx1705; Appx1759. The computer can increase the resolution in the user's field of view by fetching and displaying more detailed, higher-resolution images. *See* Appx1230:13–1232:4 (explaining claimed method's operation); Appx1044:5–1047:6 (explaining Google Earth operation). So, for example, a user viewing a map showing all of the United States could smoothly zoom in on a particular city, then a particular street within that city—and then back out to the original map.

The underlying computer data structure that makes this possible is known as a "tree." *See* Appx1031:10–16. This structure is made up of "nodes" that contain data. In the technology at issue here, each tree

node is a discrete collection of data related to an image at the appropriate resolution level. *E.g.*, Appx0611:22–24. The tree structure has a single root node that, in turn, has internal references pointing to several (usually four or eight) nodes at the next higher resolution level. *See* Appx0111; Appx1034:18–20. Each of those "child" nodes in turn has data references linking it to its own child nodes at the next higher resolution, until the maximum resolution is reached. *See* Appx1032:22–1033:10. Those linkages form the tree's "branches." Appx0640:2–6. Nodes at the same tree level (*i.e.*, nodes the same number of steps from the root node) all have the same resolution level. *See* Appx1033:14–15.

This image shows a schematic of a tree data structure with a root node and four levels of child nodes. To simplify the structure, not all of the child nodes have been expanded to show their own child nodes:



Appx3299.

In Google Earth, for instance, the root node covers "the whole world." Appx1036:2–3. There are more than twenty intermediate resolution levels between this world-spanning view and the highest detail level, in which nodes have pictures of areas "only . . . five or 10 feet on a side." Appx1035:21–1036:12.

*The Method of the Asserted Claims*. U.S. Patent No. RE44,550 describes a specific method of using these tree structures to allow users

to navigate across a field of geographic data. This method provides a continuous zooming transition across the field of view.

Claim 1, from which all of the asserted claims depend, is representative. *See* Appx0123 col. 10:16–44. Steps (a) through (e) of that claim describe a method of calculating a "field of view" of an "object" using the observer's "distance . . . to the object" and "angle of view." *Id.* col. 10:21–32. Once this field of view is calculated, the method: retrieves data for the portion of the object in the field of view from at least one of a network of two or more "spatially distributed data sources"; stores the data on the local computer; and displays it "in a pictorial representation." *Id.*

At step (f), the patented method uses a computer to divide each of the low-resolution viewpoint images into smaller sections—child nodes of the low-resolution parent-node image. The patented method then walks through each of the child nodes at this next higher resolution level. For each node, the patented method retrieves, stores, and displays—in that order—higher-resolution data for each of the smaller sections. Appx0123 col. 10:33–41 (step (f)); *see also* Appx1221:21–1222:5 (describing operation according to patented method).

At step (g) the patented method repeats the process—dividing those smaller sections into even smaller sections, then again methodically retrieving, storing, and displaying the higher-resolution images across the entirety of the viewing field at this second higher resolution level. *See id.* col. 10:42–44 (step (g)). This process repeats until the image "has the desired image resolution or no higher image resolution data is available." *Id.* The result is a continuous, coarse-to-fine transition across the entire field of view.

Claim 1 recites in full:

> 1. A method of providing a pictorial representation of space-related data of a selectable object, the representation corresponding to a view of the object by an observer with a selectable location and a selectable direction of view comprising:
>
> (a) providing a plurality of spatially distributed data sources for storing space-related data;
>
> (b) determining a field of view including an area of the object to be represented through a selection of a distance of the observer to the object and an angle of view of the observer to the object;
>
> (c) requesting data for the field of view from at least one of the plurality of spatially distributed data sources;
>
> (d) centrally storing the data for the field of view;

(e) representing the data for the field of view in a pictorial representation having one or more sections;

(f) using a computer, dividing each of the one or more sections having image resolutions below a desired image resolution into a plurality of smaller sections, requesting higher resolution space-related data for each of the smaller sections from at least one of the plurality of spatially distributed data sources, centrally storing the higher resolution space-related data, and representing the data for the field of view in the pictorial representation; and

(g) repeating step (f), dividing the sections into smaller sections, until every section has the desired image resolution or no higher image resolution data is available.

Appx0123 col. 10:16–44.

***The Accused Products.*** The accused Google Earth products prioritize speed over screen-wide smooth transitions. Google uses a tree whose nodes contain metadata—a "menu," Appx1226:17–20, or "table of contents" to the image data stored on its servers, Appx1031:4–8. Google's method first "traverse[s]" or "walk[s] [its] way down the tree to . . . visit each of the[] nodes to find out" whether it is relevant—that is, "whether it's in the [field of] view or not." Appx1038:5–9; *see also* Appx1237:1–11. Google's method divides the image into child nodes all the way to the highest available resolution first—before it begins retrieving, storing, or displaying any higher-resolution node image.

Appx1046:1–3 ("[W]e actually do the complete traversal first, and then we start to do requests."); Appx1237:6–9 ("So we are dividing, but we're not requesting and storing and representing anything at this stage. We traverse the entire metadata tree . . . .").

While traversing the tree, Google Earth assembles a "shopping list" of relevant nodes that it will retrieve for later display. Appx1038; Appx1237:4–5; ACI Br. 20 (conceding that Google Earth "searches down the data tree" and "computes the list of nodes that match the required level of detail"). Then, so that it can "make an image . . . . as quickly as possible," Google Earth reorganizes its shopping list so that it prioritizes fetching nodes that contain images with the "appropriate resolution for the given view." Appx1041:12–1042:4; *see also* Appx1237:23–1238:10. As a result, Google Earth requests and displays child nodes at the desired resolution without first requesting their parent nodes; and once those child nodes are displayed, Google Earth does not request or display the parent nodes in forming the final image. *See, e.g.*, Appx6353–6354. Because of this prioritization of higher-resolution nodes, only some—not "each"—of the nodes in the tree are

requested and displayed, while others are skipped.  *Id.*; *see also* Appx1236:21–1246:2.

**The Prior Art.**  The '550 patent is a reissue of U.S. Patent No. RE41,428, which is itself a reissue of U.S. Patent No. 6,100,897.  *See* Appx0106.  The application that matured into the '897 patent was filed in the United States on December 17, 1996.  *Id.*  Thus, the critical date for purposes of § 102(b) anticipation is December 17, 1995.  *See* 35 U.S.C. § 102(b) (2006).

At trial, Google presented two primary pieces of prior art.  The first was a paper authored by Art+Com itself, describing its later-patented invention under the name T_Vision.  Appx1701–1714.  This paper was published in August 1995 to attendees of SIGGRAPH 95, an annual computer-imaging conference.  *See* Appx1150:21–1151:3; Appx1298:12–13; Appx0457:5–7.  The conference was open to the public and attended by "computer scientists and people who are in industries related to computer graphics."  Appx1150:14–20.  Despite publishing the T_Vision paper in August 1995 and a German patent application on December 22, 1995, Appx0106, Art+Com did not file the U.S. patent

application until December 1996, more than one year after the T_Vision paper's publication. *See, e.g.*, Appx1299:6–22.

The second piece of prior art offered by Google was a fully operational terrain-visualization system called TerraVision, created by Stephen Lau and Yvan Leclerc at the nonprofit research institute SRI. Appx1156:6–18; Appx1160:3–9. SRI TerraVision was a federally funded public-domain project. *See* Appx1178:9–13. It allowed the user to navigate around a two- or three-dimensional representation of a geographic area and to zoom in and out to different levels of detail. *See* Appx2565 at 0:47–1:35 (video of TerraVision in operation). Like the claimed invention, SRI TerraVision used a tree data structure to allow navigation and zooming, Appx1163:22–1164:15, and drew its image data from a network of multiple servers, Appx1162:16–24.

The jury heard extensive testimony from Mr. Lau describing SRI TerraVision and introducing documents that explained in detail how the system worked. Appx1156:6–1187:13. The jury also saw a 1994 VHS video showing SRI TerraVision in operation. Appx1161:2–20; *see also* Appx2565 (DTX-1088, original video exhibit).

Mr. Lau testified that he demonstrated SRI TerraVision to an audience of about one hundred people at the 1994 MAGIC Technical Symposium, Appx1185:8–1186:14, and that he demonstrated it again to an audience of about 500 people at SIGGRAPH 95, Appx1175:13–1176:15. Mr. Lau also testified that at SIGGRAPH 95, he gave Art+Com copies of the SRI TerraVision "source code, walked them through it, and talked to them about it." Appx1178:18–20. Both of these public demonstrations of SRI TerraVision preceded the December 1995 critical date for the '550 patent, as did corroborating documents from 1993, 1994, and 1995 that Mr. Lau discussed in his testimony. *E.g.*, Appx1758–1777 (SRI Technical Paper); Appx1167:20–1168:3 (Lau testimony about paper's April 1994 publication date); Appx3258–3271 (MAGIC project overview); Appx1170:16–23 (Lau testimony about paper's December 1993 publication date); Appx1778–1978 (proceedings of 1995 MAGIC technical symposium); Appx1171:1–6 (Lau testimony describing distribution of document at August 1995 MAGIC technical symposium).

Google also introduced a third prior art reference, U.S. Patent No. 4,972,319, issued to David Delorme on November 20, 1990. Appx2085–

2114. The patent covers a "global mapping system" that "organizes mapping data into a hierarchy of successive magnitudes or levels." Appx2085 (Abstract). Google introduced this patent primarily to show that the idea of coordinate transformations was well known in the art. *See, e.g.*, Appx2107 col. 26:51–57.

### B. Procedural History

On February 20, 2014, Art+Com filed a complaint in the U.S. District Court for the District of Delaware alleging that Google had infringed the '550 patent. On April 28, 2016, the district court granted summary judgment to Google that any infringement was not willful, reasoning that under then-controlling precedent, Art+Com had to show—and failed to show—that Google "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." Appx6167.

On April 29, 2016, Judge Timothy Dyk of this Court was designated to the District of Delaware and assigned to this case. Order (Dist. Ct. ECF No. 356).

Beginning on May 19, 2016, the parties tried infringement, validity, and damages to a jury. Google first offered testimony from

corporate representative Peter Birch, who described the method of operation of the accused Google Earth Products. Appx1023:21–1050:7. Mr. Lau then testified about the SRI TerraVision system and his demonstrations of it in 1994 and 1995. Appx1156:6–1187:11. Google's expert, Dr. Michael Goodchild, opined that the accused Google Earth products, as described in Mr. Birch's testimony and other evidence, did not infringe. Appx1211:15–22; Appx1221:16–1250:18 (detailed comparison of Google Earth and the claim limitations). Dr. Goodchild also explained how both the SRI TerraVision system and the T_Vision paper anticipated or rendered obvious the asserted claims. Appx1260:20–1277:7; 1295:7–1313:1.

After Google rested, Art+Com offered only a single witness in rebuttal and asked him only a single question directed to one of the disputed infringement issues ("Dr. Castleman, how does Google Earth show a smooth zoom if all steps of F are not performed?"). *See* Appx1494:16–1495:13. Art+Com offered no rebuttal to any of Google's invalidity arguments. *Id.*

On May 27, 2016, at 12:30, the court gave the case to the jury with a special verdict form. Appx1685:18–19; *see also* Appx0101–0105. The

jury promptly returned a unanimous verdict that (1) Google had not infringed the asserted claims, (2) the asserted claims were invalid as anticipated by SRI TerraVision, (3) claims 1, 14, and 28 were invalid as anticipated by the T_Vision paper, and (4) claim 3 was invalid as obvious over the combination of the T_Vision paper and the '319 patent. Appx1688:5–1690:2; *see also* Appx0101–0105. Because the jury found anticipation by both patents, it did not reach (1) obviousness of all claims in view of SRI TerraVision and the knowledge of a person of ordinary skill, or (2) obviousness of claims 1, 14, and 28 in view of the T_Vision paper and the knowledge of a person of ordinary skill. *See* Appx0103–0104.

On September 9, 2016, the district court denied Art+Com's post-judgment motions. Appx6338, Appx6347. The district court found that there was "substantial evidence, such as the testimony from Mr. Birch and Dr. Goodchild," that Google Earth does not infringe the claims because it skips nodes—*i.e.*, does not request, store, and represent "each" intermediate node. Appx6354.

Turning to invalidity, the court concluded that there was substantial evidence to support anticipation by both SRI TerraVision

and the T_Vision paper, as well as obviousness of claim 3 over the T_Vision paper plus the '319 patent. *See* Appx6357–6375. The court concluded that, contrary to Art+Com's assertion that Mr. Lau's testimony was uncorroborated, "contemporaneous video and documentary evidence corroborate Mr. Lau's and Dr. Goodchild's testimony about what was demonstrated at the 1994 MAGIC Symposium and SIGGRAPH 95." Appx6362. The district court pointed out that Art+Com misapprehended the standard for whether those demonstrations were public uses, because the question is not whether the inner workings of the invention would have been visible to the public but rather "whether the invention is 'used without restriction of any kind.'" Appx6362–6364 (quoting *Egbert v. Lippmann*, 104 U.S. 333, 336 (1881). There was substantial evidence that SRI TerraVision was "ready for patenting" because Mr. Lau "and his team demonstrated [it] at the 1994 MAGIC Technical Symposium . . . and the SIGGRAPH '95 conference," including "live demonstrations . . . to at least 500 people." Appx6366. The court noted Mr. Lau had "'g[iven] the source code to TerraVision' to ACI employees who were in attendance and 'walk[ed] them through the source code." Appx6366.

The court found substantial evidence in the record that the T_Vision paper anticipated the asserted claims. Appx6369–6371. And it rejected Art+Com's challenge to the jury's determination that claim 3 would be obvious: a person of ordinary skill "could obtain from the prior art itself a motivation to combine" the teachings of the T_Vision paper with the coordinate transformations disclosed as a well-known tool in the art in the '319 patent. Appx6375. Those combinations would be "no more than the 'mere application of a known technique to a piece of prior art ready for the improvement.'" *Id.* (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007)).

Art+Com appealed.

## SUMMARY OF THE ARGUMENT

**I.** Art+Com never proved infringement because it never showed that the accused products performed steps (f) and (g) of independent claim 1. On appeal, Art+Com once again fails to carry its burden, instead suggesting that Google failed to show noninfringement. But Art+Com bore the burden of proof, not Google.

In any event, Google demonstrated that its products do not infringe for two independent reasons. First, the accused products do

not perform the "dividing," "requesting," "storing," and "representing" limitations of step (f) for "each of the smaller sections," as the claim language requires. Instead, they perform these steps only for *some* smaller sections.

Second, the accused products *never* perform step (g), which requires repeating step (f) *after* step (f)'s limitations of "dividing," "requesting," "storing," and "representing" images at a particular level of resolution are completed. The accused products instead perform "dividing" all the way to the highest level of resolution before ever "requesting," "storing," or "representing" *any* of the sections. Art+Com never addressed this second argument either in post-trial briefing or in its opening brief on appeal. It has therefore waived any challenge to the jury's finding on step (g), which alone requires affirmance of the non-infringement verdict.

Art+Com tries a new claim-construction argument—one it never raised until after trial. Art+Com argues that when step (f) requires dividing "one or more sections" into smaller sections, and performing certain operations for each of the smaller sections, it does *not* actually require that those operations be performed for each of the smaller

sections.  That argument, in addition to being waived, contradicts the plain language of the claims.

**II.A.**  Substantial evidence supports the jury's finding of anticipation by SRI TerraVision.  Google proved that SRI TerraVision was publicly used before the critical date.  Google also presented both fact and expert opinion demonstrating that SRI TerraVision anticipated.  The jury was entitled to rely on that evidence.

**B.**  Substantial evidence also supports the jury's finding that claims 1, 14, and 28 were anticipated by the T_Vision paper, which disclosed each of the disputed claim steps.  For step (b), the T_Vision paper disclosed using the viewer's "position and direction" to calculate "the currently needed data" to display, Appx1705—all that the claim limitation requires.  For step (f), the very same image reproduced in Art+Com's brief showing the T_Vision paper's subdivision of image segments teaches using level of detail for smaller sections.  And for step (g), the T_Vision paper teaches requesting data "with an appropriate resolution," Appx1705, and using a tree "of different depth depending on the maximum resolution of the . . . particular sector,"

Appx1708—thus disclosing the two termination conditions Art+Com now asserts are absent from the reference.

**C.** Finally, substantial evidence supports the jury's conclusion that claim 3 was obvious in view of the T_Vision paper in combination with the '319 patent. Art+Com does not deny that the combination would render claim 3 obvious—it merely argues that Google did not present sufficient evidence of motivation to combine the coordinate transformations in the '319 patent with the T_Vision paper. But Art+Com ignores Mr. Lau's testimony explaining why an ordinarily skilled artisan would use coordinate transformation in this field.

**III**. Although this Court need not reach the issue, enhanced damages would clearly be inappropriate in this case. The district court's conclusion that Google's behavior was objectively reasonable is borne out by a unanimous jury verdict. Nor did Art+Com provide any evidence of subjective bad faith on Google's part.

## STANDARD OF REVIEW

This Court may reverse denial of a motion for judgment as a matter of law following a jury verdict only if "(1) the jury's factual findings, presumed or express, cannot be supported by substantial

evidence, or (2) the legal conclusions implied from the jury's verdict cannot be supported by the jury's factual findings." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1300 (Fed. Cir. 2002). The court must "determine whether[,] viewing the evidence in the light most favorable to the non-moving party, and giving the non-movant the benefit of all reasonable inferences, there is sufficient evidence of record to support a jury verdict in favor of the non-movant." *Id.* (quotation marks omitted).

The jury is "free to discard or disbelieve whatever facts are inconsistent with its conclusion." *Lavender v. Kurn*, 327 U.S. 645, 653 (1946). This Court presumes that "all factual disputes were resolved in favor of the verdict." *Agrizap Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1343 (Fed. Cir. 2008).

This Court reviews *de novo* a grant of summary judgment. *Sun Tiger, Inc. v. Sci. Research Funding Grp.*, 189 F.3d 1327, 1333 (Fed. Cir. 1999).

## ARGUMENT

## I.    Substantial Evidence Supports The Jury's Finding Of Noninfringement.

Art+Com had the burden of proving infringement.  *E.g.*, *Medtronic Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 846 (2014).  It failed.  Art+Com offered only conclusory expert testimony that Google's products performed key claim steps, namely that the accused products "request[]," "stor[e]" and "represent[]" *each* node, and do so in that order, during traversal of the tree.  That testimony is insufficient as a matter of law to support an infringement verdict, much less to reverse a noninfringement verdict.  What is more, Google presented compelling evidence explaining why its products do not infringe.

### A.    Art+Com Failed To Prove That Google's Products Performed The "Storing" And "Representing" Limitations Of Step (f).

Art+Com's conclusory expert testimony is insufficient as a matter of law to prove infringement.  Art+Com's affirmative infringement case as to the "storing" and "representing" limitations of step (f) fits on a single transcript page and consists of four questions and answers—two of which are the witness seeking to clarify the question:

> Q. Now, before we check off some boxes, there is some other language in step F that we have not talked about.

24

Do you see about four lines in where we need to centrally store the higher resolution space-related data?

A. You're talking about step F?

Q. Yes, I am, centrally storing the higher resolution space-related data.

A. And your question is?

Q. My question is, is this done in all three of the Google products, all three groups?

A. Yes, they all do it.

Q. Likewise for all three of these products, are data of the field of view represented in a pictorial representation?

A. Yes, they all three do that, too.

Appx0713:2–18.  Art+Com offered no other evidence on these claim limitations—indeed, as its counsel pointed out, the witness "ha[d] not talked about" these limitations in his prior testimony.  *Id.* at ll. 3–4; *see also generally* Appx0694–0712.  Later, on rebuttal of Google's invalidity case, Dr. Castleman offered one further conclusory answer based not on any analysis of the source code or documentation, but on his unsubstantiated belief that Google's products just worked too smoothly to operate the way Google claimed.  Appx1494:16–1495:13.

This "expert's unsupported conclusion on the ultimate issue of infringement" would be "insufficient [even] to raise a genuine issue of

material fact." *See Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000). It certainly does not establish infringement as a matter of law. Nor does Art+Com's "framing [of] the expert's conclusion as an assertion that a particular critical claim limitation is found" in the accused product allow it to "avoid that rule." *Id.*

On cross-examination, Dr. Castleman admitted that he *had not even done the analysis* required to prove Art+Com's infringement case. Dr. Castleman agreed that step (f) requires "storing" and "representing" *every* smaller section within the field of view. *See* Appx0753:6–10; Appx0754:6–21. But when asked whether his review of Google's source code addressed "whether any nodes get ignored after data has been requested for them," he admitted that he "d[id]n't recall specifically looking at that question." Appx0764:14–19. This admission demonstrates absence of proof. *See Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (conclusory testimony unsupported by "any examinations or tests of the actual accused products" is insufficient to support a finding of infringement).

On appeal, Art+Com understandably runs from its failure to meet its burden and instead focuses its entire infringement argument on a

spurious claim that *Google* failed to show *non*infringement. *See* ACI Br. 38–42. This, of course, is not enough to prove infringement: Art+Com was, and is, required to prove infringement by a preponderance of the evidence. *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1348 (Fed. Cir. 2013).

Moreover, Google did disprove infringement. It presented testimony from its corporate representative—Peter Birch, Google Earth's project manager from 2006 to 2012—that explained how Google's products operate. Google then presented testimony from its expert, Dr. Michael Goodchild, confirming that Google Earth's operation differs from the claimed invention.

Mr. Birch described in detail the steps Google Earth performs when rendering an image at a given resolution level. First, it traverses *all* of the nodes associated with image tiles in the user's field of view. Appx1040:4–20. In this traversal, image tiles at many resolution levels, from the coarsest to the desired or maximum resolution level, are divided immediately. Appx1038:1–14 (explaining traversal process); *see also* Appx1042:21–23 ("[T]he traversing time here is really, really fast, like less than a blink of an eye. It's in milliseconds."). Google Earth

then reprioritizes the traversed nodes so that nodes associated with image tiles at the appropriate resolution will be requested from Google's servers first, before nodes associated with image tiles having coarser resolution. Appx1040:21–1042:9. The user's device then requests the images in that reprioritized order—which means that higher-resolution image tiles for child nodes are retrieved, stored, and rendered on the user's device *before* parent nodes are requested. *See* Appx1046.

Dr. Goodchild explained that this operation does not perform step (f) of Claim 1. He testified that because of the prioritization of higher-resolution nodes, Google Earth does not request, store, and represent "each of the smaller sections" of the image. *See* Appx0123 col. 10:35–41; Appx1229:17–22. Dr. Goodchild walked the jury carefully through the operation of the claimed invention according to the '550 patent. Appx1231:18–1235:13. Then he demonstrated that Google Earth "skips some of the smaller sections"—that it does not "request or represent each of the smaller sections, and therefore, it does not infringe claim 1, step F." Appx1242:22–23; Appx1244:2–4. The jury was entitled to believe this testimony, especially because Art+Com presented no legally sufficient contrary evidence.

Art+Com tries to sow doubt by arguing that a single line of source code in the file `lod-manager.js` shows the accused products perform coarse-to-fine zooming, not "node-skipping," by default. ACI Br. 41–42. As the district court found, however, the "source code is not entirely clear on its face," and "[b]oth parties offered testimony as to what the source code required," including "testimony from Mr. Birch and Dr. Goodchild[] as to the node-skipping operation of Google Earth." Appx6353–6354; *see also* Appx1046:4–1048:23; Appx1243:8–14; 19–22. The district court correctly concluded that "the jury was entitled to believe Google's witnesses." *Id.*; *see Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir. 1976).

Moreover, Art+Com's contention is legally irrelevant, as the district court observed. By Art+Com's own account, Google Earth uses a "node-skipping" setting some of the time. ACI Br. 41–42. Although it is generally true that "an accused device that sometimes, but not always, embodies a claim nonetheless infringes," *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (internal quotation marks, brackets, and citation omitted), step (f) requires that the relevant steps be performed in *each* instance. Appx6354. Claim 1 of

the '550 patent requires practicing step (f) for "each of the smaller sections." Appx0123 col. 10:33–41. Thus, skipping nodes even some of the time would be enough to preclude infringement of step (f).

## B. Art+Com Failed To Prove That Google's Products Perform Step (g).

Art+Com failed to show infringement for a second, independent reason—one not raised in Art+Com's post-trial briefing or its appeal brief: Art+Com failed to show that Google's products perform step (g). That step requires "repeating step (f), dividing the sections into smaller sections, until every section has the desired resolution or no higher image resolution data is available." Appx0123 col. 10:42–44.

Art+Com admitted during claim construction that step (g) must follow step (f). During the *Markman* hearing, the court asked Art+Com's counsel, "Well, you would say that on that one, step G has to be done after step F. Right?" Appx6322:22–24. Counsel responded "Well, yes. I mean, clearly, step G has to be done after step F." Appx6323:1–2. That was so because step (g) requires "repeating step F," so "step F has to have been conducted first." Appx6323:3–4. The court later ruled that "step G has to be performed after step F" because Art+Com had "conceded that point." Appx0548:8–12. Art+Com never

showed, and could not show, that Google's products perform step (f) even once before performing step (g).

And, again, Google demonstrated that it did not infringe: Dr. Goodchild showed the jury how a system operating according to the claims would work. In performing step (f) followed by step (g), the computer would systematically perform "division, retrieval and representation" as the process "work[ed] down the tree." Appx1246:21–24; *see also generally* Appx1244:16–1247:2. Because the accused Google products perform *all* of the "dividing" steps required by both step (f) and step (g) before performing *any* of the "requesting," "storing," and "representing" procedures from either step, they never complete step (f) and thus never reach step (g). *See* Appx1247:9–14 ("[T]here is no question here of repeating [step (f)] because the dividing does not lead to retrieving, storing, and representing, and we can proceed to further divisions without execut[ing] all of step F."); *see also* Appx6381–6382 (Google's motion for JMOL raising this issue).

Art+Com nowhere contests this second theory of noninfringement. Accordingly, it has forfeited any argument that Google performs step (g). *See, e.g.*, *Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d

1312, 1320 (Fed. Cir. 2006) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'") (quoting *Laborers Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)).

### C. Art+Com's Arguments Are Based On A Waived And Incorrect Claim Construction.

After trial, Art+Com raised a claim-construction argument that it had not raised before—namely, that the "one or more sections" relevant to step (f) are the "one or more sections" represented pictorially in step (e). Because it never raised this claim-construction argument until after trial, the argument is waived. *See Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1331 (Fed. Cir. 2009).

It is also wrong. Under the plain claim language, the "one or more sections" in step (f) refers to the same "one or more sections" in step (e) only on the *first* iteration of step (f). Step (e) recites "representing the data for the field of view in a pictorial representation having one or more sections." Appx0123 col. 10:31–32. Step (f) then recites "dividing each of the one or more sections . . . into a plurality of smaller sections" and then requesting, storing, and representing the smaller sections.

32

Appx0123 col. 10:33–41. Step (g) then recites "repeating step (f), dividing the sections into smaller sections, until every section has the desired image resolution or no higher image resolution data is available." Appx0123 col. 10:42–44. Step (g) thereby calls for repeating step (f) on the smaller sections created during steps (f) and (g), not on the same sections from step (e) that were already divided and acted upon in step (f).

Art+Com asks, "why repeat step (f) on data that won't be displayed?" Br. 40. Because that is how the claimed method works: in order to satisfy step (f), the data for "*each* of the smaller sections" must be "request[ed]" and "centrally stor[ed]" *before* the claimed invention "represent[s] the data for the field of view." Appx0123 col. 10:33–41 (emphasis added). In denying Google's § 101 motion, the district court relied on the patent's "iterative process" as an "ordered combination" of steps. *See* Appx6076; Appx6336. Having prevailed on that basis, Art+Com is now estopped from changing that position and pressing an argument that would ignore the "iterative process" on which it and the court relied. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

Art+Com's waived, incorrect claim construction offers no reason to overturn the jury's verdict of noninfringement.

## II. Substantial Evidence Supports the Jury's Finding of Invalidity.

A "jury verdict of invalidity should be upheld if there was sufficient evidence to support any of the alternative theories of invalidity." *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1339 (Fed. Cir. 2011). Here, there are multiple such theories. Google presented compelling evidence of not one but two instances of anticipation: first, a public demonstration of the SRI TerraVision system; and, second, Art+Com's *own* paper on its *own* later-patented invention, T_Vision.

Anticipation is a question of fact, reviewed for substantial evidence. *E.g.*, *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1341 (Fed. Cir. 2016). A reference anticipates a patent claim if it describes every element and limitation of a claim "so as to place a person of ordinary skill in possession of the invention." *Sanofi–Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1082 (Fed. Cir. 2008). Viewing the evidence presented to the jury in the light most favorable to the verdict, and drawing all reasonable inferences in favor of Google, there is no

question that substantial evidence supports the jury's unanimous verdict. *See Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1333 (Fed. Cir. 1991).

The evidence was more than substantial: the jury heard testimony from a fact witness, Steven Lau, who described the TerraVision system he helped develop at SRI. Appx1156:6–1187:11. During this testimony, the jury viewed a demonstration video showing the SRI TerraVision system in action and explaining its operation. Appx1161:2–20; *see also* Appx2565 (video). Mr. Lau also testified that he had received Art+Com's T_Vision paper—which described the later-patented invention—as an attendee at the same 1995 conference where he demonstrated the SRI product. Appx1182:17–1184:3. The jury then heard testimony from Google's expert Dr. Michael Goodchild, who explained how each of the two references anticipated the asserted claims. Appx1252:4–1277:7; Appx1295:7–1313:1.

The jury was entitled to believe this evidence, which went unrebutted. *See* Appx1494:16–1495:13 (entire rebuttal case, consisting of single question and answer directed to infringement).

## A. The Asserted Claims Are Invalid Because SRI TerraVision Anticipated Them.

The SRI TerraVision system was a federally funded, public-domain terrain-visualization application. Appx1157:11; Appx1159:8–12. It allowed a user to navigate freely over a two- or three-dimensional representation of terrain, and to zoom smoothly in and out to different levels of detail. Appx2565 (video exhibit showing SRI TerraVision in action). The system drew its image data from a distributed database with image servers at Berkeley, the University of Kansas, the U.S. Geological Survey in Sioux Falls, and the Minnesota Supercomputer Center. Appx1162:18–24.

The jury saw a 1994 VHS video of SRI TerraVision in operation. *See* Appx2565. Although the video has degraded somewhat over the intervening two decades, SRI TerraVision's method of operation is readily visible—including its method of performing coarse-to-fine resolution transitions generated by dividing the image into smaller segments and sequentially requesting and displaying higher-resolution images for each segment. *E.g.*, *id.* at 6:39–6:56.

The jury also heard testimony from one of the system's inventors, Mr. Lau, describing how the system operated. Appx1158:7–1187:11.

He described how SRI TerraVision used "a frustum, a field of view" to "project out where you're looking in the terrain" and "be able to figure out which tiles are the best tiles for that view." Appx1163:13–21. He discussed TerraVision's use of a "coarse to fine search on a Quadtree representation of the terrain." Appx1168:20–22. He described the geographically distributed network of computers that stored and served the image data. Appx1172:5–17. He explained how SRI TerraVision used "coordinate transformers" to avoid "precision errors" with "very big" floating-point numbers representing "latitude and longitude coordinates." *See* Appx1173:20–1174:22. He described demonstrating SRI TerraVision at two public conferences in 1994 and 1995. Appx1175:17–1176:15; Appx1186:2–20. And he introduced the jury to documents, published contemporaneously with the demonstrations, detailing the system's method of operation. *E.g.*, Appx1758–1777 (LeClerc SRI Technical Paper); Appx3258–3271 (MAGIC project overview); Appx1778–1978 (MAGIC symposium proceedings).

The jury then heard from Google's expert, who opined that SRI TerraVision anticipated the asserted claims. Appx1260:20–1276:16.

Again, the jury heard no rebuttal to any of this evidence. *See* Appx1494–1495.

On appeal, Art+Com tries to rebut the case it never rebutted at trial. Not one of its contentions has merit.[1]

***(a) SRI TerraVision Was Publicly Demonstrated More Than A Year Before The Patent Application.*** Mr. Lau, a former SRI employee who developed SRI TerraVision with his late colleague Yvan Leclerc, testified that he had performed live demonstrations of SRI TerraVision at the 1994 MAGIC Technical Symposium and at the August 1995 SIGGRAPH '95 conference—both of which were more than a year before the December 17, 1996 filing of the application that eventually led to the '550 patent. Appx1175:4–6*; see* Appx0106. At

---

[1] Even if this Court were to conclude that Art+Com was right about anticipation, it is wrong about the remedy. *See* ACI Br. 62. Because the jury found that all of the claims were anticipated by SRI TerraVision and that three of them were anticipated by the T_Vision paper, it never reached the question whether the claims were obvious in view of those references and the knowledge of a person of ordinary skill. *See* Appx0103–0104. Neither did the district court. Appx6367 n.7. Dr. Goodchild testified that although he discerned no differences between the prior art and the asserted claims, any such differences would have been obvious to one of skill in the art. *See* Appx1276:23–1277:5; Appx1306:11–17; Appx1308:14–1309:1. Because the jury never reached those questions, Google would be entitled at least to a new trial on obviousness.

SIGGRAPH, Mr. Lau's audience was "approximately . . . 500" people. Appx1176:13–15. Indeed, Art+Com personnel saw the system at SIGGRAPH, and Mr. Lau "provided them with the [SRI TerraVision] source code, walked them through it and talked to them about it." Appx1178:16–20.

Mr. Lau also testified about several contemporaneous documents that described the system's features in detail. *See, e.g.*, Appx1167–1171 (discussing SRI technical paper, overview of MAGIC network project, and proceedings from the 1995 MAGIC technical symposium). He testified that the "features of TerraVision that w[ere] demonstrated at SIGGRAPH 1995" were "the same that w[ere] . . . in the papers that had been published to date, including" those that Google had introduced into evidence. Appx1177:1–5. Based on Mr. Lau's well-corroborated and unrebutted testimony, the jury was entitled to find that SRI TerraVision was publicly used before the critical December 1995 date. *See also* Appx6356.

Art+Com nevertheless casts aspersions on Mr. Lau, suggesting that because Google compensated him for his consultation, he had an "interest in the dispute." ACI Br. 47. Mr. Lau was paid to consult, not

to testify. His $450-per-hour rate was disclosed to the jury. Appx1157:21–1158:2. And as the jury heard, his compensation did not in any way depend on either the testimony he gave or the outcome of the case. Appx1158:3–6. The district court described Mr. Lau's testimony as "forthright, careful, and candid," Appx6345, and correctly concluded that—contrary to Art+Com's insinuations—"there was nothing to indicate his testimony was influenced by payments," Appx6368 n.9. Credibility is a question of fact for the jury that is not reviewable on appeal. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1192 (Fed. Cir. 1998) ("It is not the province of an appellate court to second guess the jury's credibility determinations . . . .").

**(b) Google's Trial Presentation Was Proper.** Citing no authority, Art+Com contends that it was somehow improper for Google's expert, Dr. Goodchild, to opine on what an ordinarily skilled practitioner would have understood from the publicly demonstrated system, based on papers that Google's fact witness identified as explaining how that system worked. ACI Br. 50–51.

That is the proper division of labor between fact and expert witnesses. Mr. Lau—the fact witness—testified in depth about the

system for which he "wrote about 89 percent of the source code." Appx1158:12–13; *see also generally* Appx1156–1187 (Lau testimony). He concluded that the "features of TerraVision that w[ere] demonstrated" during his 1994 MAGIC Conference and SIGGRAPH 95 demonstrations were "the same that w[ere] . . . in the papers that had been published to date, including the ones that we have talked about." Appx1177:1–5 (SIGGRAPH); *see also* Appx1187:1–3 (MAGIC). Dr. Goodchild—the expert witness—then opined on what a person of ordinary skill in the art would understand from the demonstrations and papers. Appx1260:20–1277:7; *see also* Appx1295:7–1296:4.

After hearing Google's direct examination and Art+Com's cross-examination of both witnesses, and after seeing Art+Com decline to put on any rebuttal evidence, the jury chose to credit Google's evidence—as it was entitled to do. *See, e.g., Lavender*, 327 U.S. at 653.

***(c) Google Demonstrated By Clear And Convincing Evidence That SRI TerraVision Performed Steps (b) and (c).*** Although Art+Com contends that Google failed to prove that SRI TerraVision performed certain claim steps, it focuses on two narrow pieces of testimony to the exclusion of the rest of the record. *See* ACI Br. 51–52.

41

Step (b) requires "determining a field of view including an area of the object to be represented through a selection of a distance of the observer to the object and an angle of view of the observer to the object." Appx0123 col. 10:23–26. Step (c) then requires "requesting data for the field of view from at least one of the plurality of spatially distributed data sources." *Id.* ll. 27–28.

Art+Com focuses on Dr. Goodchild's reliance on the Leclerc–Lau paper's reference to SRI TerraVision's "incremental retrieval of the database." *See* Appx1266–1267; *see also* Appx1760. But Art+Com ignores two other key pieces of evidence introduced at trial. First, immediately after the portion of testimony quoted by Art+Com, Dr. Goodchild referred the jury to the video demonstration. Appx1267:13–1268:13. That video notes that "data is fetched across the network as it is needed while the user moves about the terrain." Appx2656 at 0:59–1:04. While that verbal description plays, the video shows TerraVision displaying geographic data at the correct distance and from the user's angle of view—and not displaying data from outside that field of view. *See id.*; *cf.* Appx0123 col. 10:23–26.

Second, Mr. Lau testified about how SRI TerraVision computes what to display. Appx1163:13–21. He testified that SRI TerraVision uses "a frustum, a field of view" and would "project out where you're looking in the terrain and where you're at, figure out how far away each of the tiles should be." *Id.* From there, "you would be able to figure out which tiles are the best tiles for that view." *Id.* This testimony describes SRI TerraVision functionality that reads directly on the claim language that Art+Com says is missing.

**(d) Google Demonstrated By Clear And Convincing Evidence That SRI TerraVision Performed Steps (f) and (g).** For steps (f) and (g), Art+Com again ignores much of the record. Art+Com relies, in isolation, on the following sentence from one document describing SRI TerraVision

> TerraVision basically uses an incremental retrieval of the database as required by the user, rather than forcing the user to copy a part of the database to local storage, visualizing that part, and repeating this until he/she has found the portion of the terrain that was of interest.

Appx1760; *see* ACI Br. 52. According to Art+Com, the "rather than" clause extends all the way to the end of the sentence, so that the "repeating this until he/she has found the portion of the terrain that

was of interest," in Art+Com's view, "defines something TerraVision did not do." *Id.*

Dr. Goodchild conceded that the sentence's syntax is "not very clear." Appx1338:6. But he explained that "once we get to [']visualizing that part[,] and repeating this until he/she has found a portion of interest,['] that now follows the first part of the sentence rather than following the section after the comma." *Id.* ll. 4–14; *see also* Appx6359. That was at least a reasonable understanding of the sentence in question, especially in the context of the other record evidence, which Art+Com tries to elide:

- The same Leclerc–Lau reference teaches a "search algorithm" that uses "recursive subdivision" for each node, where "a test is applied to determine whether or not the node should be sub-divided into its four children. If so, the search is carried on. Otherwise, it is stopped." Appx1766.

- Mr. Lau testified that SRI TerraVision used a "quadtree" and "coarse to fine resolution pyramid" whereby it "would take a large sample of one tile, subdivide that into four down to the next lower level resolution . . . until you got to the fine

resolution, the highest resolution you had." Appx1163:22–1164:15.

- The SRI TerraVision video and script similarly explain that the system used a "resolution pyramid," where "each level of the pyramid covers the entire terrain, but uses only 1/4 as many tiles as the previous level," and that when using this pyramid to "request[] higher-resolution tiles from the server, . . . the image becomes progressively better focused." Appx3532–3533; Appx2656 at 6:00–7:20.

Based on the evidence as a whole, Dr. Goodchild testified that SRI TerraVision used a "quadtree" to perform a coarse-to-fine search that would "successively divide and request" image data. Appx1268:22–1269:1. The jury was entitled to agree. *See* Appx6359.

***(e) Art+Com Ignores Clear And Convincing Evidence That SRI TerraVision Anticipated Claim 3.*** Art+Com argues that Google did not sufficiently demonstrate that SRI TerraVision performed the coordinate translation of Claim 3. It contends that the "*claimed coordinate transformation is one that follows . . . a change in the selectable location.*" ACI Br. 53; *see* Appx0123 col. 10:45–50 (claims 2 &

3). But the jury heard evidence that SRI TerraVision performed exactly that kind of coordinate transformation. Mr. Lau testified that SRI TerraVision performed coordinate transformation "from latitude longitude . . . back to the origin, like zero zero zero zero zero." Appx1174:4–6. When asked why the system performed that transformation, Mr. Lau explained that it helped avoid precision errors when dealing with large floating-point numbers after moving from one location to another:

> [B]ecause you were able to *teleport and move from various locations very quickly* like say from Wilmington, Delaware here, which had one set of latitude and longitude coordinates to say Seattle, Washington, which had a completely different set of latitude longitude coordinates, those [coordinates] are very big numbers. . . . And at the time you could get precision errors in doing those calculations. *So what we did is we normalized that down, brought those down, translated you back to zero zero zero, wherever your point of view was, in Wilmington or Seattle and used a coordinate system based upon that.*

*Id.* ll. 9–22 (emphasis added). The jury was entitled to believe that evidence.

**(f) Art+Com Ignores Controlling Law And The Record In Arguing That The Public Could Not Discern The Claimed Invention**. Art+Com contends that "Google did not attempt to prove

that the public could actually discern the patented invention in SRI TerraVision." ACI Br. 54–55. Under the controlling precedent of *Egbert*, 104 U.S. at 336, the relevant question is not whether the inner workings of the invention were on full display to the public but rather whether the use of those inner workings was made "without restriction of any kind." *Id.*

The district court correctly reasoned that "the SRI TerraVision system was publicly demonstrated at two technical conferences, to attendees with knowledge in the art, without restriction or effort to maintain confidentiality." Appx6364. Art+Com simply wishes away these and other facts inconvenient for its argument. For example, the papers on which Dr. Goodchild based his testimony were themselves publicly available. *E.g.*, Appx1167:13–19 (describing the SRI technical paper as "published" in "April of 1994"); Appx1170:16–23 (describing publication process of MAGIC overview paper); Appx1171:3–6 (proceedings of MAGIC symposium "handed to attendees").

More damning, Mr. Lau testified that even the source code for SRI TerraVision was made publicly available—and given to Art+Com itself. Appx1177:21–1178:7; *see also* Appx1178:9–13 (describing SRI

TerraVision as "meant to be put in the public domain so people could use those algorithms in the spirit of collaboration"). The district court concluded that even absent the other evidence, the jury could have found that this single disclosure would have satisfied the public-use requirement because "every detail was disclosed by the provision of the source code to Art+Com" and "[a] single public use is sufficient." Appx6365.

Art+Com cites only inapposite case law making the uncontroversial point that confidential uses are not public uses within the meaning of § 102(b). *Id.* In *Dey, L.P. v. Sunovion Pharms., Inc.*, 715 F.3d 1351, 1353–57 (Fed. Cir. 2013), this Court concluded that a reasonable jury could find the use in question "controlled and restricted, rather than unfettered and public," when the "disclosure is limited to a small number of uninformed observers," restrictions on how the test subjects used the drugs, and confidentiality agreements imposed by the investigators. *See also* Appx6364. In *Delano Farms Co. v. Cal. Table Grape Comm'n*, 778 F.3d 1243, 1249–50 (Fed. Cir. 2015), this Court concluded there was no public use because the facts showed the use of grape plants was "confidential and non-public," *id.* at 1249. There,

"unreleased varieties" of grapes "were not labeled in any way," and there was "no evidence that any person other than the [secret users] had ever recognized the unreleased varieties." *Id.*; *see also* Appx6364.

Here, in contrast, there was no "secret third-party use." *See Dey*, 715 F.3d at 1358–59. The public was fully "informed of" and could "readily discern[] the claimed features of the invention." *Id.* at 1359 The public was quite literally "put in possession of" the claimed features, *id.*, because the entire system was *in the public domain*, *e.g.*, Appx1159:6–12. The jury was entitled to conclude that these disclosures constituted an unrestricted public use.

**(g) The TerraVision System Was "Ready For Patenting."**
Finally, Art+Com argues that SRI TerraVision was not "ready for patenting" because it was "nothing more than a work in progress." ACI Br. 56. Art+Com also insinuates that this Court should consider SRI's decision not to seek a patent—for its *public-domain* system that was paid for by public funding—as further evidence that it was not ready for patenting. *See id.* at 67.

That is not the test. An invention is ready for patenting when it is "reduc[ed] to practice" or when "the inventor had prepared drawings or

other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). "An invention is reduced to practice when it works for its intended purpose"—that is, "when there is a demonstration of its workability or utility." *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1366–67 (Fed. Cir. 2008). Thus, in *Atlanta Attachment*, this Court found that a prior-art device was ready for patenting when a "prototype" of the device "demonstrated the workability and utility of the invention . . . during a demonstration." *Id.* at 1367. In *Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*, this Court similarly found a prior-art product ready for patenting when there were "working prototypes" that "met all the limitations of the asserted patent claims" and retail customers were provided with "specific descriptions" and "drawings" of the device. 726 F.3d 1370, 1378–79 (Fed. Cir. 2013).

Here, Mr. Lau testified that the system was sufficiently complete for public demonstration by mid-1994—as evidenced by the two public demonstrations he described on the record. Appx1175:15–1177:15; Appx1186:2–1187:11. Mr. Lau testified that SRI chose not to seek a

patent because the system was "meant for the public domain" and was "funded by the federal government"—not because of any incompleteness. Appx1159:19–21. Indeed, the demonstrations featured a fully operational prototype system that implemented the features described in SRI's technical publications. Appx1175:15–1177:15; Appx1186:2–1187:11

Art+Com argues that the TerraVision system still faced "challenges" and "research issues." ACI Br. 56–57. But an invention may be reduced to practice "even though it may later be refined or improved." *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002). As Dr. Goodchild testified, this demonstrated system met all of the limitations of the asserted claims and thus reduced the claimed invention to practice. Appx1260:20–1277:7. The district court agreed. Appx6365–6367. The jury was entitled to rely on this evidence.

## B. The T_Vision Paper Anticipated Claims 1, 14, and 28.

Art+Com published its T_Vision paper to the attendees of SIGGRAPH '95 before the December 1995 critical date for § 102(b) anticipation. *See, e.g.*, Appx1299:8–15. Google's expert, Dr. Goodchild,

walked the jury through a detailed description of where each of the claim limitations in steps 1, 14, and 28 could be found in the T_Vision paper. Appx1298–1308.

What is more, the evidence before the jury included the paper itself, which is short and readily understandable to a lay audience—and which clearly describes the claimed invention. Appx1701–1714. The paper discloses an "earth visualization project" implemented in a "broad-band application." Appx1703. Data for this application is in a "distributed database," Appx1705, a "transparent and worldwide broad-band, networked topography and surface data bank," Appx1704. A viewer using the system uses a "Space Mouse" to "control the viewer[']s position and angle of view," Appx1710, from which the system can "calculate[] the currently needed data" and then "request[] the data for a special location with an appropriate resolution," Appx1705. It then represents the data for the "particular sector of the planet" in images divided into square or rectangular "sectors." Appx1707. The data in the database is "organized as a quadtree, containing higher levels of detail as you descend down the tree." Appx1705.

Again, Art+Com offered *no* rebuttal testimony. Google's uncontroverted evidence was more than sufficient for the jury to conclude that the T_Vision paper anticipated the asserted claims. Sufficient evidence supports the jury's verdict at each step.

Art+Com argues that the disclosure does not anticipate step (b) because it does not "mention[] fields of view, observers and objects, or how angles and distances between the same might be used to determine a field of view." ACI Br. 46. But Dr. Goodchild pointed out that the reference discloses that the system "calculates the currently needed data" to display from "viewing and flight parameters like position and direction." Appx1705; *see* Appx1350. As Art+Com's expert Dr. Castleman described it, that is all the system needs: the field of view is calculated from the "location of the camera in space" and "the particular angle that the camera is turned to looking at the earth." Appx0636:18–19, 22–23. Those requirements are certainly all the patent discloses: it says that "[t]he portion of the object to be observed, the field of view, is determined from the selected *location* and the selected *direction of view* of the observer." Appx0119 col. 2:22–24 (emphasis added). The T_Vision paper's teaching disclosed the claim step to a person skilled in

the art.  *See also* Appx0419:11–0420:5.  Art+Com's demand for a more express disclosure ignores both the legal standard for anticipation, which looks to the understanding of a person skilled in the art, and the jury's role as factfinder.  Appx6370 n.11 (citing *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1373–74 (Fed. Cir. 2005)).

At step (f), Art+Com contends that the reference fails to "describe using level of detail as a criterion for subdividing image segments."  ACI Br. 46.  But the image from the reference reproduced in its own brief shows otherwise:



ACI Br. 46 (reproducing Appx1707).  This image, which is nearly identical to a portion of Figure 5 of the '550 patent, *see* Appx0112, shows "bounds generated by binary subdivision of the whole coordinate system."  Appx1707.  And it does exactly what Art+Com claims the reference does not do:  the "number of digits corresponds to the level of detail; *the higher the number, the finer the resolution.*"  *Id.*  (emphasis

added); *see also* Appx1705 ("The database is organized as a quadtree, containing higher levels of detail as you descend down the tree.").

At step (g), Art+Com contends that the reference "cannot possibly disclose the *two* termination conditions defined in step (g)," ACI Br. 46–47, which are that (1) "every section has the desired image resolution," or (2) "no higher image resolution data is available." Appx0123 col. 10:43–44. Art+Com is wrong on both counts. The T_Vision reference discloses that the system operates by "request[ing] the data for a . . . location *with an appropriate resolution*." Appx1705. The reference further describes the system as using a "tree of different depth depending on the maximum resolution of the source maps that cover the particular sector." Appx1708. This discloses the second termination condition because the system cannot navigate a tree at any given location beyond the "maximum resolution" available for that location.

Art+Com strains to argue that its patent disclosed an invention distinct from that in its T_Vision paper. But there is a more straightforward explanation: they disclose the same invention, and Art+Com filed its U.S. patent application too late to avoid Section

102(b).  *See generally* Birgit Millauer & Elspeth Simpson White, *The § 102(b) Foreign Filing Catch*, Law360 (Jan. 8, 2009), *available at* https://goo.gl/vvH28A.

## C. The T_Vision Paper Plus The '319 Patent Rendered Claim 3 Obvious.

Art+Com does not contest that the T_Vision paper, if combined with the coordinate transformation taught by the '319 patent, would have rendered claim 3 obvious.  *See* ACI Br. 58–59.  Instead, it argues only that Google did not present sufficient evidence for the jury to have found motivation to combine the two references.  *Id.*

Art+Com—again—ignores the record.  Aside from the testimony Art+Com quotes, Google introduced other evidence of the motivation to combine the coordinate transformation with a system like that in the T_Vision paper.  For example, Mr. Lau testified that, without using coordinate transformations, "you could get precision errors" in doing calculations on "latitude and longitude coordinates" because of contemporary computers' limited ability to handle "very big numbers." Appx1174:15–18.  As Mr. Mayer, a named inventor on the '550 patent admitted, coordinate transformations "existed long before [he] applied

for [his] patent" and had been around "probably about as long as there have been coordinate systems." Appx428:20–429:7.

Art+Com also misrepresents the law. The Supreme Court has spoken on this question:

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, *using the technique is obvious unless its actual application is beyond his or her skill.*

*KSR*, 550 U.S. at 417. That passage might as well have been written about the combination of the T_Vision paper and the '319 patent.

Dr. Goodchild testified that the combination would have been obvious to one of ordinary skill in the art. Appx1311:6–11. The '319 patent is directed to implementing a "global mapping system which organizes mapping data into a hierarchy of successive magnitudes or levels for presentation of the mapping data with variable resolution." Appx2085 (abstract). The patent discloses a "computer implemented method and system for manipulating and accessing digital mapping data in a tremendous database, and for the reproduction and display of

electronic display maps which are representative of the geographical . . . features of a selected geographical area." Appx2097 col. 6:9–15. It is therefore within "precisely the same field of endeavor as the T_Vision paper." Appx6374.

The coordinate transformation technique taught in the '319 patent was a "predictable variation," a "known technique" that had been "used to improve one device," and the T_Vision paper disclosed a "similar device" that was, moreover, "ready for the improvement." *KSR*, 550 U.S. at 417. Art+Com does not argue that the use of coordinate transformations was "beyond the . . . skill" of an ordinarily skilled practitioner at the time of the invention. *Id.* As the district court concluded, "[a] person of ordinary skill in the art could obtain from the prior art itself a motivation to combine the T_Vision paper and the Global Mapping patent." Appx6375. Thus "using the technique is obvious." *KSR*, 550 U.S. at 417.

## III. Art+Com Does Not Merit Enhanced Damages.

Although this Court need not reach the question, the district court's grant of summary judgment on enhanced damages was correct.

Under *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, enhanced damages are "generally . . . reserved for egregious cases typified by willful misconduct." 136 S. Ct. 1923, 1934 (2016). The Supreme Court described the "conduct warranting enhanced damages" as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant—or, indeed—characteristic of a pirate." *Id.* at 1932.

Art+Com asks for a new damages trial that will consider willfulness because of *Halo*'s abrogation of this Court's decision in *In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc). ACI Br. 60–62. Though the objective reasonableness of an accused infringer's positions no longer controls, it is still "relevant for the district court to consider when exercising its discretion." *WesternGeco L.L.C. v. ION Geophys. Corp.*, 837 F.3d 1358, 1363 (Fed. Cir. 2016). The district court correctly found that Google's actions were objectively reasonable. Appx6096. And later events proved the district court correct: a jury unanimously found Google had not infringed and the asserted claims are invalid. The court upheld both findings. *See generally* Appx6357–6375.

Nor were Google's noninfringement and invalidity positions developed only in the shadow of litigation. When Art+Com first contacted Google to gauge interest in licensing the '550 patent, Google concluded—and told Art+Com repeatedly—that the accused Google Earth products did not infringe. Appx0393:4–21 (Art+Com inventor Pavel Mayer explaining that Google told him "they were not using the patented technology"); Appx1115:22–1116:4; *see also* Appx1134:14–17. Then–Google patent counsel Michelle Lee pointed out that there were "a number of issues regarding the patent." Appx0397:23–0398:16. Google sent Art+Com the SRI TerraVision prior art, which it believed anticipated Art+Com's patent. Appx0402:20–0403:4. And as the jury found, Google was right.

The Supreme Court directed the district courts to "take into account the particular circumstances of each case." *Halo*, 136 S.Ct. at 1933–34. The circumstances here include a plaintiff that was *handed the source code* to one of the prior art products—one that Art+Com had seen demonstrated and thus knew was the same as its own purported invention. Art+Com communicated with the SRI TerraVision team in June of 1995 and described SRI TerraVision as "based on the same

technology." Appx3272. And Art+Com filed its application too late to avoid its own T_Vision publications becoming prior art.

No reasonable jury could conclude that Google's behavior was "wanton" or its actions taken in "bad[ ]faith." *See Halo*, 136 S. Ct. at 1932. Google's behavior simply did not constitute the kind of "flagrant," "bad-faith" activity that would justify an enhanced damages award. *See id.* at 1932–34.

## CONCLUSION

Google respectfully requests affirmance of the judgment of the district court.

Respectfully submitted,

Dated: March 13, 2017

/s/ Daryl L. Joseffer
Daryl L. Joseffer
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
djoseffer@kslaw.com
jmitchell@kslaw.com

## CERTIFICATE OF SERVICE

I certify that on March 30, 2017, I caused the foregoing corrected brief to be filed with the Court electronically using the CM/ECF system, which will send a notification to all counsel of record.


March 30, 2017                    /s/ Daryl L. Joseffer
                                  Daryl L. Joseffer

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,409 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


March 13, 2017                    /s/ Daryl L. Josseffer
                                  Daryl L. Josseffer