**No. 2017-1016**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**ART + COM INNOVATIONPOOL GMBH**
**Plaintiff-Appellant**

**v.**

**GOOGLE INC.**
**Defendant-Appellee**

---

# CORRECTED REPLY BRIEF OF PLAINTIFF-APPELLANT

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IN CASE NO: 1:14-CV-00217 JUDGE TIMOTHY B. DYK**

**BAKER BOTTS L.L.P.**
Scott F. Partridge
(Principal Attorney)
L. Gene Spears
Michael Hawes
One Shell Plaza
910 Louisiana
Houston, Texas 77002
713.229.1234
713.229.1522 (Facsimile)
E-mail scott.partridge@bakerbotts.com

Attorneys for Appellant

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ART+COM Innovationpool GmbH **v.** Google Inc.

Case No. 2017-1016

## CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| ART+COM Innovationpool GmbH | ART+COM Innovationpool GmbH | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Baker Botts LLP: Scott Partridge, L. Gene Spears, Michael Hawes, C. Ryan Pinckney, Thomas Rooney: see attached page

April 3, 2017
Date

/s/ Scott F. Partridge
Signature of counsel

Please Note: All questions must be answered

Scott F. Partridge
Printed name of counsel

cc: All counsel of record

Reset Fields

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
ART+COM Innovationpool GmbH v. Google, Inc.

17-1016
CERTIFICATE OF INTEREST
Continuation Page

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Baker Botts L.L.P. cont'd: Michelle Jacobson Eber, M. Natalie Alfaro, Jennifer Nall;

Lisa C. Kelly and Lisa M. Thomas-no longer with this firm.

Farnan LLP: Michael J. Farnan, Brian E. Farnan

# TABLE OF CONTENTS

I. GOOGLE INFRINGES THE '550 PATENT ....................................................1

A. ACI Proved Google's Infringement............................................................3

B. Google's "Pre-Traversal" Argument is Unfounded and Irrelevant .............4

C. Google's "Node-skipping" is Likewise Unfounded and Irrelevant.............7

1. Nodes Are Not Routinely "Skipped" in Google Earth .........................8

2. "Node-Skipping" Is Extraneous and Irrelevant to Claim 1................12

II. THE '550 PATENT INVENTION WAS NOT PUBLICLY USED ................13

A. Mr. Lau Did Not Prove a Public Use of the Claimed Invention................15

B. Dr. Goodchild Did Not Prove a Public Use of the Claimed Invention ......17

1. He Did Not Prove Steps (b) and (c) Were Practiced..........................18

2. He Did Not Prove Steps (f) and (g) Were Practiced ..........................20

C. Google Failed to Prove Material Elements of its Defense.........................22

1. SRI Terravision Was Not Proved Ready For Patenting......................22

2. Terravision's Operative Details Were Not Publicly Discernable .......25

D. Google Failed to Prove Claim 3 Practiced in Terravision .........................27

III. THE T_VISION PAPER DID NOT ANTICIPATE THE INVENTION .........27

IV. OBVIOUSNESS NEED NOT BE RETRIED ON REMAND .........................29

V. WILLFULNESS MUST BE TRIED ON REMAND.......................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*,
516 F.3d 1361 (Fed. Cir. 2008) ....................23

*Bell Communications, Inc. v. Vitalink Communications Corp.*,
55 F.3d 615 (Fed. Cir. 1995) ....................7

*Delano Farms Co. v. California Table Grape Comm'n*,
778 F.3d 1243 (Fed. Cir. 1995) ....................26

*Dey, L.P., v. Sunovion Pharms., Inc.*,
715 F.3d 1351 (Fed. Cir. 2013) ....................25, 26

*Egbert v. Lippmann*,
104 U.S. 333 (1881)....................26

*Hamilton Beach Brands, Inc., v. Sunbeam Products, Inc.*,
736 F.3d 1370 (Fed. Cir. 2013) ....................23

*In re Seagate Technology, LLC*,
497, F.3d 1360 (Fed. Cir. 2007) (*en banc*)....................30

*Koito Manufacturing Co. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004) ....................19

*Medgraph, Inc. v. Medtronic Corp.*,
App. No. 2015-2019 (Fed. Cir. Dec. 13, 2016)....................30

*Pfaff v. Wells Elecs., Inc.*,
525 U.S. 55 (1998)....................22

*Stattec Security Corp. v. General Automotive Specialty Co., Inc.*,
126 F.3d 141 (Fed. Cir. 1997) ....................30

*Titanium Metals, Inc. v. Banner*,
779 F.2d 775 (Fed. Cir. 1985) ....................27

*Tone Bros. v. Sysco Corp.*,
28 F.3d 1192 (Fed. Cir. 1994) ....................14

**STATUTES**

35 U.S.C. § 102(a)/(b)....................................................................................15

35 U.S.C. § 200, *et. seq*..................................................................................24

## I. GOOGLE INFRINGES THE '550 PATENT

Before turning to the specific arguments advanced in Google's brief, it is enlightening to precisely review the process outputs of the steps defined in claim 1. As stated in its title, the '550 Patent provides a method "for pictorial representation of space-related data." As Google concedes, this method allows a user to "navigate[] around a map or virtually move[] over a three-dimensional landscape". Google Br. at 1. "So, for example, a user viewing a map showing all of the United States could smoothly zoom in on a particular city, then particular street within that city -- and then back out to the original map." *Id.*, at 5. That method can be restarted "immediately after this alteration in field of view," 3:35, such that an image is always represented, "even if the data are insufficient to make possible the desired image resolution." 3:41-42. "[E]ven if the method is interrupted due to an alteration in the field of view and newly begun for a new field of view, the data for an image, even at low resolution, are always available." 3:44-45.

Critical to understanding the process outputs of steps (a) through (e) of claim 1 is the recognition that those steps define a process for building the *first frame* a user sees upon changing their view of this virtual landscape. Appx0694. Per step (a), spatially distributed data sources are provided to house space-related data. Applications implementing the claimed method determine a field of view (step b), request data for this field of view from those data sources (step c),

centrally store those data on the user's device (step d) and represent them in a sectioned, pictorial representation (step e). That series of steps generates one frame for pictorial display. As that frame may not be at the desired image resolution, the claim goes on to recite steps for creating further frames that sharpen the image toward that resolution.

Step (f) defines how the *second frame* is built. Appx0696. One or more sections of the image presented per step (e) of the pictorially represented first frame are divided into smaller sections. Higher image resolution data are requested -- in the same manner as lower resolution data were requested per step (c) -- from spatially distributed data sources. As the lower resolution data were centrally stored (step d) and represented pictorially (step e), step (f) likewise provides for storage and representation of higher-resolution data. Step (f) is iterative - it creates the second frame using the same method by which the first frame was created by carrying out steps (a) - (e). Once that is done, the second frame is ready for display, or as step (f) says, pictorially represented. To build the *third and subsequent frames*, step (g) tells us that step (f) is repeated until one of two terminations is met: "until every section has the desired image resolution or no higher image resolution data is available."

A. <u>ACI Proved Google's Infringement</u>

In view of how claim 1 is structured and must be read -- with step (f) building a second frame by repeating the previous steps used to build a first frame -- Google's criticism of ACI infringement case "as to the 'storing' and 'representing' limitations of step(f)" is baseless. The testimony cited at pages 24-25 of Google's brief came after Dr. Castleman explained, in over twenty pages of transcript, how space-related data are stored and represented in each of the accused product groups. Appx0672-0692. After having told the jury how the accused products "store" and "represent" data to build the first frame of an image, he did not need to repeat how the same processes are used to build the second and subsequent frames. So Dr. Castleman was asked summary questions -- are space-related data centrally stored and represented according to step (f) -- and gave summary answers, Appx0713, answers that summarize *twenty pages* of testimony he'd provided on this very point.

In another effort to contrive failures of proof which turn out to be fictitious, Google cites testimony Dr. Castleman gave when confronted with Google's theory that nodes are "skipped" for rendering in the accused products. As set forth at pages 22-24, 41-42 of ACI's opening brief -- and as documented in Google's source code and the admissions of its own engineers -- nodes are not skipped during the normal default mode of operation of Google Earth, a mode that uses

"coarse-to-fine" zooming, which Google's expert and, most recently, Google's appellate counsel identify with the claimed method. Google Br. at 9. So when Dr. Castleman "admitted" to not addressing an alternative to this default mode of operation, he did so for good reason. That's not how he understood these products to work.. Appx1494-1495.

### B. Google's "Pre-Traversal" Argument is Unfounded and Irrelevant

At pages 10-11, 27-28, and 30-31 of its brief, Google argues that because its products "perform all the of the 'dividing' steps required by both step (f) and step (g) before performing any of the 'requesting,' 'storing,' and 'representing' procedures from either step, they never complete step (f) and thus never reach step (g)." Google Br. at 31. This argument is premised on Google Earth's traversing metadata for the entire tree of space-related data before any of those data are retrieved for display. Google Br. at 11. This noninfringement "position" received little airplay at trial, and for good reason. It is wholly unfounded and based on an incomplete description of how these products work on a frame by frame basis.

As Dr. Castleman explained, step (f) is repeated once per frame:

> So basically, the first frame comes from step E. The second frame it comes from step F the first time through, and then G tells us that step F has to be repeated over and over to create all the remaining frames. Appx0715.

Google's metadata are likewise traversed frame-by-frame to determine which nodes of data to render. Google's expert identified PTX0075, a presentation made

by Google engineers, as "one of the documents that describe Google Earth's use of metadata trees." Appx1228. In that very presentation, Google confirmed that metadata are traversed every frame "to figure out which nodes to render."

4281. *See also* Appx4588 at 14:20-14:42. If this traversal process is identified with the "dividing" substep of step (f) -- and ACI agrees it is part of that process -- then steps (f) and (g) are practiced in precisely the order required by claim 1, viz:

- a Google Earth user changes the field of view by altering the location or direction of view;
- the first frame is prepared for display via steps (a)-(e);
- the node metadata are traversed as part of the process of dividing the image of the first frame, per the first iteration of step (f);
- higher resolution image data are requested, stored and represented, again per this first iteration, to prepare the second frame for display;
- the node metadata are traversed as part of the process of dividing the image of the second frame, per the second iteration of step (f);
- higher resolution image data are requested, stored and represented, again per this second iteration, to prepare the third frame for display; and
- the process repeats until one of step (g)'s termination conditions are satisfied.

While this complete traversal may also identify nodes of data that are not rendered, that process is extraneous to claim 1 and cannot avoid infringement. While Google does not say how often traversal occurs, the impression provided in its brief -- a false impression, in light of how Google Earth actually works -- is that it happens once with each shift in field of view. Even accepting that false impression for the sake of argument, *that* process is still covered by claim 1. As construed by the district court, step (f) requires only that division occur before requests are made for higher resolution image data. Appx6066. Nothing in that construction or in the claim itself requires a fresh division preceding each data request with each iteration of step (f). So a hypothetical process (as opposed to Google's Earth's actual process) in which node metadata are traversed once for each shift in the field of view also meets claim 1, viz.:

- a user changes the field of view by altering their location or direction of view;
- a complete traversal of node metadata is performed;
- the first frame is prepared for display via steps (a)-(e);
- with the node metadata having been traversed so as to divide the image of the first frame, in the first iteration of step (f), higher resolution image data are requested, stored and represented to prepare the second frame for display;

- with the node metadata having been traversed so as to divide the image of the second frame, in the second iteration of step (f), higher resolution image data are requested, stored and represented to prepare the third frame for display; and
- the process repeats until one of step (g)'s termination conditions are satisfied.

The testimony cited at page 11 of Google's brief is entirely consistent with ACI's infringement case. Yes, the Google Earth metadata tree is traversed before the application requests data from Google's servers. You cannot, as the district court recognized, request higher resolution data until some division is performed. But that traversal is done on a frame-by-frame basis and would be covered by claim 1 even if performed only once following a shift in the field of view.

C. <u>Google's "Node-skipping" is Likewise Unfounded and Irrelevant</u>

This "theory" of noninfringement, addressed at pages 27-30 of Google's brief, should be weighed in light of this Court's recognition that "an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes." *Bell Communications, Inc. v. Vitalink Communications Corp*., 55 F.3d 615, 622-23 (Fed. Cir. 1995). Google proposes that Google Earth prioritizes the display of image data such that "higher-resolution image tiles for child nodes are retrieved, stored, and rendered on the user's device before parent nodes are

requested." Google Br. at 28. As a result and according to Google, Google Earth "does not request, store and represent 'each of the smaller sections' of the image." *Id*., However, and as laid out at pages 22-24 of ACI's Opening Brief, Google Earth skips nodes only in certain irregular modes of operation. Even assuming for the sake of argument that Google Earth skipped them routinely, Google Earth would still be covered by the '550 Patent's asserted claims.

1. Nodes Are Not Routinely "Skipped" in Google Earth

Google offered one fact witness to testify about the operation of its products -- its corporate representative, Peter Birch, who served as Google Earth's product manager from 2006-2012. See Google Br. at 27. At Appx1046:7-15, cited at page 28 of Google's brief, Mr. Birch provided the following testimony:

> Q. And Mr. Birch, in the approach that's used in the accused Google Earth products, are all of the traversed nodes fetched before drawing the final scene?
>
> A. Again, *not necessarily*. And in fact, in this case, we haven't fetched all of the nodes. We've only actually fetched a portion of those nodes. (emphasis supplied).

The transcript records further examination by Google's lawyers on this point:

> Q. In the approach that's used by the accused Google Earth products, can *some* child nodes be requested before the parent node is requested?
>
> A. Yes, they can.

> Q. And in the approach used by the accused Google Earth products, can *some* child nodes be displayed before its parent is requested.
>
> A. Yes, absolutely. You can base -- again, because of this process where we're *potentially* or we're fetching the child nodes ahead of other nodes, then they can *potentially* be displayed before they are fetched -- before the parent would be fetched.

(emphasis supplied). Appx1047:7-21.

These questions, directed to *some* child nodes, and Mr. Birch's answers, directed to how Google Earth *potentially* or does *not necessarily* operate, were carefully structured to avoid perjury. At no point was Mr. Birch asked whether data in child nodes are routinely fetched and rendered ahead of data from their parents. His testimony does not contradict, because it does not address, the normal default mode of operation of Google Earth described by Dr. Castleman upon his review of the source code for these products.

Google's expert offered no opinion on whether nodes are skipped routinely in Google Earth. Dr. Goodchild performed no analysis of how often nodes are skipped. Appx1360-1361. He'd not tested Google Earth for that purpose, seen no Google documents informative of the issue and -- thanks to how Mr. Birch's testimony was carefully structured -- heard nothing on point from Google's corporate representative. *Id.* The only pertinent testimony of Dr. Goodchild's supports ACI's position.

Consistent with what Google concedes at page 9 of its brief, Google's expert equated steps (f) and (g) with a coarse-to-fine zooming process. Appx1121-1122, Appx1356. What Dr. Goodchild identified as "an example of source code for one group of the accused products that executes this prioritization process that leads out (sic., "leaves out") or skips some nodes," Appx1241-1242, is plainly commented to execute coarse-to-fine zooming *in default*. Appx1336-1338. In a presentation made at the SIGGRAPH 2014 Conference, a Google engineer (Mr. Kontkanen) explained how the normal request order, the one presented when Google Earth operates in "navigation mode," is purely coarse to fine. Appx4588 at 18:18-18:57. It is only when Google Earth operates in "deep load mode" that an image quality criterion applies, thereby causing the application to skip nodes. *Id.*, at 19:11-20:06, Appx4254. Later in the same presentation, a different engineer (Mr. Parker) explained how "deep load mode" is an exceptional mode of operation invoked only ten percent of the time when the application is started from a hyperlink. Appx4588 at 42:28-43:04. Even when so activated, and as Mr. Kontkanen explained, at some point the application will shift to "navigation mode," *Id.*, at 21:51-22:36, with its pure coarse-to-fine zooming.

This is not a case where conflicting evidence was weighed as to how Google Earth normally or routinely operates. Google's counsel studiously avoided eliciting this testimony from Mr. Birch. Google's expert performed no analysis of

how often nodes are skipped. Google's source code indicates that coarse-to-fine zooming is done by default. Google has not, because it cannot, point to any source code or other evidence suggesting otherwise. Nor does Google attempt to walk back its expert's admissions that coarse-to-fine zooming is the very process defined in steps (f) and (g) of claim 1. Indeed, Google's appellate counsel seems to agree with this. Google Br. at 9.

Instead, Google invokes the district court's findings on ACI's Rule 50(b) motion as somehow supportive of the judgment below. Google Br. at 29. They are not. Those findings will be afforded no deference under this Court's *de novo* standard of review. To decide the issues presented in this appeal, this Court need not even read Judge Dyk's decision, since nothing in that decision can constitute "evidence" supporting the jury's verdict.

Apparently recognizing the noninfringement argument it sold the jury goes to an exceptional mode of operation, Google resorts to a legal argument: because step (f) requires the relevant substeps be performed in each instance, *any* node-skipping would preclude infringement. Google Br. at 29-30. This cribbed reading of claim 1 has odd consequences when applied to Google Earth. In ninety percent of sessions -- i.e., in those not initiated by a hyperlink -- the application runs entirely in "navigation mode" without skipping nodes. For ninety percent of its users, Google ran the claimed method *all the time*. For those ten percent of

sessions that start in "deep load mode," the application will shift to "navigation mode," where nodes are no longer skipped. Claim 1 cannot possibly require that Google practice the method for each and every Google Earth user for the full time the application runs. That is, in effect, how Google is asking this Court to construe this claim -- a construction Google didn't dare advance to the district court, likely to protect its credibility.

2. "Node-Skipping" Is Extraneous and Irrelevant to Claim 1

At pages 38-39 of its Opening Brief, ACI explained how claim 1 of the '550 Patent plainly allows for the node-skipping Google claims to occur in its products. After a first frame is represented per step (e), the "one or more sections" divided per step (f) are, in context, sections of that frame. Higher resolution image data are then requested, stored and represented in a second frame. When step (f) is repeated to build the third frame, the "one or more sections" divided in this reiteration are sections of the second frame, previously represented. If, in the course of carrying out the patented method, nodes are skipped and their data not rendered, this process is extraneous to the claimed method, which is directed entirely to images to be rendered (i.e., pictorially displayed) and progressively sharpened.

Google is correct that "[s]tep (g) thereby calls for repeating step (f) on the smaller sections created during steps (f) and (g), not on the same sections from step

(e) that were already divided and acted upon in step (f)." Google Br. at 33. But when step (f) is repeated, e.g., to build the third frame following a shift in the field of view, *something* has to be divided. That *something* is the "one or more sections" of "the pictorial representation" of the second frame, i.e., of the data pictorially represented per the first iteration of step (f).

It is perhaps for this reason that Google devotes the bulk of its briefing to unfounded claims of waiver. ACI has waived nothing. The position ACI is taking before this Court is based on the plain language of step (f), language that would even allow for nodes to be skipped and their data not rendered. Before the district court, the only departure ACI advocated from this plain language, and which that court did not adopt, was clarification that the "division" defined in step (f) was a logical division, as opposed to a physical one. Appx6056.

This Court has never imposed on patentees the burden of predicting and addressing *as a matter of claim construction* every argument an infringer may eventually devise to wiggle out of patent infringement. At some point, resort must be had to the claim's plain language. That's exactly what ACI has done here.

## II. THE '550 PATENT INVENTION WAS NOT PUBLICLY USED

The key to unlocking Google's public use defense is provided at page 47 of Google's brief. There, in response to ACI's argument that, even if demonstrated

via SRI Terravision, its claimed invention would not have been discernable to the public, Google contends "the papers on which Dr. Goodchild based his testimony were themselves publicly available." The principal policy underlying the public use bar is to prevent "the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available." *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 1198 (Fed. Cir. 1994). If, after having seen SRI Terravision demonstrated at the 1994 Magic Symposium and/or SIGGRAPH '95, an attendee must follow in Dr. Goodchild's footsteps, that is, locate and pick through hundreds of pages of documents in order to figure out what they just saw, then the public would have no idea what was placed in the public domain (and became freely available) by the demonstration itself.

When viewed in this light, Google's anticipation defense has little to do with what the public observed at 1994 Magic Symposium or at SIGGRAPH '95. Its actual defense is more like one of obviousness dressed in public use clothing, obviousness based on the combined disclosures of DTXs 1023, 1037, and 1087 -- none of which were proven up as published prior art. Mr. Lau, who observed the SIGGRAPH demonstrations, provided only cursory testimony as to what operations SRI Terravision performed *at that demonstration*.[1] Because Dr.

[1] Even if his self-contradictory claim to having observed the 1994 Magic Symposium demonstration is credited, see Appx1196-1197, his testimony as to what was demonstrated *at that event* is superficial.

Goodchild attended neither demonstration, he needed outside sources to explain what was demonstrated. Apparently having found Mr. Lau's testimony insufficient to illuminate what was demonstrated, he looked to three documents (DTX's 1023, 1087 and 1037) purporting to describe SRI Terravision. However, not one of those documents is a description of either demonstration, that is, they do not identify or describe what was demonstrated. Nonetheless, without a direct tie to the demonstrations themselves, Dr. Goodchild proceeded to the jury to where *those documents* purport to disclose the steps of the claimed methods. *See* Appx1266-1267, Appx1269-1270, Appx1272-1273. This is a classic, if highly deficient, obviousness analysis, performed on documents Google never proved were "published," as 35 U.S.C. § 102(a)/(b) requires of such "prior art."

A. Mr. Lau Did Not Prove a Public Use of the Claimed Invention

The scant testimony Mr. Lau offered as to what was demonstrated at the 1994 Magic Symposium and/or SIGGRAPH '95 does not support the jury's verdict of invalidity. Little of what Google claims to be "testimony . . . describing how the system operated," Google Br. at 36 (citing Appx1158-1187), is directed to operative details of SRI Terravision. And none of it purports to describe operations actually performed or witnessed at the 1994 Magic Symposium or at SIGGRAPH '95.

At Appx1163, cited on page 37 of Google's brief, Mr. Lau testified to what happened *in some instances* when SRI Terravision was used, without indicating whether any of those "instances" featured in the system's demonstration at the 1994 Magic Symposium or at SIGGRAPH '95. Appx1163:1-2, 10-11. Mr. Lau's testimony that Terravision might at times use a frustum to determine "which tiles are the best tiles for that view," Appx1163:20-11, falls short of the claimed invention, which requires those tiles be the *only* tiles for which data are requested, stored and rendered.

At Appx1168:20-22, likewise cited at page 37 of Google's Brief, Mr. Lau reads from a document (DTX1023) purporting to describe a "coarse to fine search on a Quadtree representation of the terrain." He is not testifying such a search was done by the system demonstrated at the 1994 Magic Symposium or at SIGGRAPH 95. At Appx1172:5-17, Mr. Lau points the jury to a computer network illustrated in a document -- DTX1036, which was not cited in Dr. Goodchild's testimony -- without stating this network was part of either alleged public use. In the final testimony Google cites at page 37, Mr. Lau claims to have implemented an origin-shifting coordinate transformation in SRI Terravision, without suggesting *when* that was done. *See* Appx1173-1174. That omission is critical, as Mr. Lau's work on SRI Terravision continued through May of 1996, Appx1030, well past the '550 Patent's December, 1995 critical date.

When Mr. Lau was asked to tell the jury what "features" of SRI Terravision were demonstrated at SIGGRAPH '95, he did not enumerate a single one. Instead, he referred the jury to a "really, really grainy" video, DTX1088 (Appx2565), *see also* Appx1160-1161, and to "papers that had been published to date, including the ones that we talked about." Appx1176-1177. Presumably, those "papers" were DTXs 1023, 1036, 1037, 1087 and 1193, though Mr. Lau did not come out and say this. Nor did he point the jury to any "feature" in a specific "paper" that was demonstrated. Mr. Lau's testimony as to what, if anything, was demonstrated at the 1994 Magic Symposium was equally uninformative. Appx1186-1187.

B. Dr. Goodchild Did Not Prove a Public Use of the Claimed Invention

Dr. Goodchild did not, as Google suggests, "opine[] on what a person of ordinary skill the art would understand from the [1994 Magic Conference and SIGGRAPH '95] demonstrations and papers." Google Br. at 41. He did not attend either demonstration. He'd heard no testimony -- from Mr. Lau or from any other witness -- as to what specifically was demonstrated. His opinions as to "what a person of ordinary skill in the art" would understand were grounded almost entirely in the "papers." None of those "papers" purport to memorialize what was demonstrated, either at the 1994 Magic Symposium or at SIGGRAPH '95. Two of the "papers" Dr. Goodchild claimed to disclose steps of the claimed method, DTXs 1023 and 1037, were created *before* these events transpired. *See* Appx1266-

1267, Appx1269 (citing DTX1023 as disclosing steps (b) and (c) of claim 1); Appx1270 (citing DTX1023 as disclosing steps (f) and (g) of claim 1); Appx1272-1273 (citing, *inter alia*, DTXs 1023 and 1037, as disclosing the coordinate transformation of claim 3).

### 1. He Did Not Prove Steps (b) and (c) Were Practiced

As ACI noted at page 52 of its opening brief, Dr. Goodchild based his opinion that steps (b) and (c) of claim 1, which call for determining a field of view and requesting data for it, are "found" in DTX1023, specifically in its reference to "incremental retrieval of the database." Appx1266-1267. On cross-examination, he conceded this disclosure does not "state what increment is being used to retrieve the data, whether it's been done in increments of field of view or some other type of increment." Appx1332. Apparently agreeing steps (b) and (c) are not disclosed in DTX1023, Google now proposes that *other* evidence, specifically the "grainy, grainy video" of DTX1088 (Appx2565), demonstrates these steps were practiced at the 1994 Magic Symposium and/or SIGGRAPH '95. Google Br. at 42-43.

The jury heard no evidence as to where or how steps (b) and (c) are illustrated in the video. After sponsoring a slide with screen shots of that video, Dr. Goodchild provided the following testimony:

> Q. Does that video excerpt further support your opinion that the SRI Terravision system discloses the features of Steps B through E of claim 1?

A. Yes it does. Appx1266.

This summary and conclusory testimony, directed generally to steps (b) through (e), is not clear and convincing proof that steps (b) and (c) were demonstrated in this "grainy, grainy video." *See Koito Manufacturing Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004). Because its expert provided no explanation, Google's lawyers have stepped in to fill the gap. Their claim, advanced at page 42 of Google's brief, that this video "shows TerraVision displaying geographic data at the correct distance and from the user's angle of view" is wholly unfounded. Substantial evidence, if any, does not establish what criteria were used to select the data displayed in that video.

DTX1023, which Dr. Goodchild actually relied upon for his opinions, expressly states that data are requested beyond those needed to render the current field of view. Instead of doing what is required by claim 1, i.e., requesting data for the field of view selectable by the observer, the system described in that paper pre-fetches terrain data before they are needed for rendering. It does so to address inherent delays in retrieving information from the database. Appx1760. If, as Dr. Goodchild seems to believe, DTX1023 and the DTX1088 video both pertain to the same system, then the terrain displayed in the video would have likewise been built from pre-fetched data, as opposed to data limited to the current field of view.

Finally, and at page 43 of its brief, Google cites Mr. Lau's testimony regarding Terravision's use of "a frustrum, a field of view," testimony Dr. Goodchild chose not to cite, and for good reason. Because Mr. Lau was describing what happened *in some instances*, Appx1163:1-2, 10-11, Google's expert could not link that testimony to what was demonstrated at the 1994 Magic Symposium or at SIGGRAPH '95. Because steps (b) and (c) limit the data requested to data for the field of view *and only those data*, Mr. Lau's claim that Terravision, in certain instances, used a frustum to determine "which tiles are the best tiles for that view," Appx1163:20-11, would not have aided Dr. Goodchild's effort to convince the jury that steps (b) and (c) were practiced in this system.

2. He Did Not Prove Steps (f) and (g) Were Practiced

Dr. Goodchild's opinion that steps (f) and (g) were demonstrated at the 1994 Magic Symposium and/or SIGGRAPH '95 was based entirely on the following text from DTX1023:

> Terravision basically uses an incremental retrieval of the data base as required by the user, *rather than* forcing the user to copy a part of the database to local storage, visualizing that part, and repeating this until he/she has found the portion of the terrain that was of interest. Appx1760 (emphasis supplied).

At pages 43-44 of its brief, Google argues that the highlighted language modifies the first two gerunds that follow ("forcing . . .", "visualizing . . .") but not the third ("repeating . . ."). That we are even having this conversation -- and over

language Google's expert concedes is "not very clear," Appx1338, -- proves at least two things: (1) that Google's "defense" really is an incompetent obviousness defense based on documents not proven up as published prior art, and (2) that the proof Google tendered in support of this defense is far from clear and convincing.

The other "evidence" Google mentions at pages 44-45 of its brief was not cited by Dr. Goodchild as support for his opinion that steps (f) and (g) were demonstrated at the 1994 Magic Symposium and/or SIGGRAPH '95. And for good reason. DTX1023's reference to a "recursive subdivision" in which "a test is applied," discloses neither the specifics of that test (as required in step (f)) or when the subdivision ends (as required in step(g)). While Mr. Lau's testimony, Appx1163-1164 arguably comes somewhat closer to the mark, it is not directed to the system as demonstrated at the 1994 Magic Symposium and/or SIGGRAPH '95. Nor does it disclose the second of step (g)'s two termination conditions, i.e., "repeating . . . until . . . no higher image resolution data is available." The Terravision video and script, Appx3532-3533; Appx2565 at 6:00-7:20, fall even further afield. The "resolution pyramid" described therein discloses neither step (g)'s termination conditions nor step (f)'s use of field of view as a criterion for subdividing images. It is, perhaps, for this reason that Dr. Goodchild chose not to cite this "evidence" as support for his opinion.

C. Google Failed to Prove Material Elements of its Defense

Because Google was passing off an obviousness defense as a defense of public use, it neglected to address two elements of that defense. Specifically, Google did not prove SRI Terravision was ready for patenting when publicly demonstrated. Nor did Google prove -- as the law requires for third-party public uses -- that observers of these demonstrations could have ascertained the claimed invention.

1. SRI Terravision Was Not Proved Ready For Patenting

ACI agrees with Google's take on the law. Per *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998), an invention is ready for patenting when it is "reduc[ed] to practice" or when "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." Having offered no evidence of an enabling -- enabling of the '550 Patent methods -- written description of SRI Terravision, Google argues instead for an actual reduction to practice. Google's evidence of this consists entirely of Mr. Lau's claim "that the system was sufficiently complete for public demonstration by mid-1994." Google Br. at 50. This testimony falls well shy of the clear and convincing proof Google needs of a reduction to practice that supports it defense.

"An invention is reduced to practice when it works for its intended purpose," *Atlanta Attachment Co. v. Leggett & Platt, Inc*., 516 F.3d 1361, 1366 (Fed. Cir. 2008), such as when a commercial sewing machine is proven operative to adjust sewing speed at desired locations without user intervention, i*d*., at 1367, or when a prototype slow cooker is built and successfully tested to confirm that it worked as intended, i.e., with the lid sealed to prevent leakage. *Hamilton Beach Brands, Inc., v. Sunbeam Products, Inc*., 736 F.3d 1370, 79 (Fed. Cir. 2013). Because Google did not treat this as an element of its defense, it offered no comparable evidence that SRI Terravision worked for *any* purpose, much less an *intended* purpose. Was SRI Terravision ever tested (as opposed to simply viewed)? By what criteria was it evaluated? We have no idea because Mr. Lau did not tell us. At best, he and his coworkers could display "grainy, grainy video" of a highly restricted terrain set. Appx1859 . Even if this limited ability to put terrain on a screen amounted to a reduction to practice of *something* -- which ACI seriously doubts -- it is not a reduction to practice of *ACI's invention*, which is what the law requires.

Apparently recognizing that Terravision was not worth patenting, Mr. Lau and his coworkers chose not to patent it. Google's explanation for this -- that Terravision was "a public domain system that was paid for by public funding" -- misperceives the relevant legal landscape. In 1980, years before Mr. Lau's first

work on Terravision, the Bayh-Dole Act built a comprehensive framework for patenting inventions funded by the public. *See* 35 U.S.C. § 200, *et. seq*. Even Mr. Lau readily acknowledged that public funding was no obstacle to SRI's patenting his work. Appx1191.

2. Terravision's Operative Details Were Not Publicly Discernable

Google does not contend the public could have discerned the operative details of SRI Terravision from what they witnessed, e.g., at the 1994 Magic Symposium or at SIGGRAPH '95. Instead, the argument at pages 47-48 of Google's brief is directed to what the public might have learned about that system *from other sources*. The public might, for example, have replicated Dr. Goodchild's extraneous efforts - sought out and combed through hundreds of pages of documents without reference to the demonstrations themselves to attempt to reconstruct those details. Or the public might have looked at SRI's source code and figured out what they'd seen from that. Where, as here, the alleged public use was not with the patentee's consent, the law demands much more, i.e., that the claimed invention be discernable from the use itself, that the public need dig no deeper.

Notwithstanding Google's failure to prove-up the viability of either hypothetical scavenger hunt,[2] this Court has twice rejected third-party public use "defenses" where the public could not discern what it had seen in use. The relevant teaching of *Dey, L.P., v. Sunovion Pharms., Inc.*, 715 F.3d 1351 (Fed. Cir. 2013), is not concerned with the "controlled and restricted" access of clinical trial

---

[2] Google did not prove if or how any of the papers Dr. Goodchild cited were published and available to the public. Mr. Lau's dubious claim to have given ACI his source code likewise falls short of showing how the public would have gone about finding it.

*investigators* to the claimed compositions. Instead, this Court vacated summary judgment based on the uncontrolled and unrestricted access of *participants*, who may not have been informed of and may not have readily discerned "the claimed features of the invention". *Dey*, 715 F.3d at 1359. Likewise, the relevant discussion in *Delano Farms Co. v. California Table Grape Comm'n*, 778 F.3d 1243 (Fed. Cir. 1995), is not of the individuals who observed the patented grape varieties in "an environment of confidentiality." Instead, the panel should look to how this Court (and the district court) analyzed this use, which was visible from public roads, in the context of the public at large. Because the grape varieties "cannot be reliably identified simply by viewing the growing vines alone," this Court affirmed the district court's summary judgment rejecting the Grape Commission's defense. *Delano Farms*, 778 F.3d at 1250-51.

Google proposes that *Egbert v. Lippmann*, 104 U.S. 333 (1881) , excuses its failure to prove the public could have discerned ACI's invention in SRI Terravision. But that case involved a use authorized by the patentee. The Court cited "abandonment" and "dedication to the public" as reasons to bar patentability. Where the use is by a third party, the patentee "abandons" nothing. Neither the Supreme Court's reasoning, nor *Egbert* itself, are controlling in cases like this one, where the alleged use is authorized by a third party (SRI) not by the patentee (ACI). *See Delano Farms*, 778 F.3d at 1249.

### D. Google Failed to Prove Claim 3 Practiced in Terravision

Apparently conceding the document Dr. Goodchild cited to support his opinion describes a coordinate transformation different from claim 3's, Google now cites different evidence -- namely Mr. Lau's testimony from Appx1174 -- as supporting the verdict below. However, and as noted repeatedly, Mr. Lau never stated *when* Terravision could perform the operations he described, thereby omitting a critical link between that testimony and Google's defense.

## III. THE T_VISION PAPER DID NOT ANTICIPATE THE INVENTION

ACI offered no rebuttal case on this point because the testimony it heard from Dr. Goodchild failed to demonstrate how the T_Vision Paper "show[ed] exactly," *Titanium Metals, Inc. v. Banner*, 779 F.2d 775, 780 (Fed. Cir. 1985), multiple steps defined in claim 1.

As to step (b), Dr. Goodchild agreed this reference does not state in detail how "currently needed data" are calculated from "viewing and flight parameters like position and direction." Appx1349:12-24. After conceding this point, Dr. Goodchild nonetheless proposed "it would follow that from the viewing parameters you would calculate the frustum and from that you would intersect it with the earth and calculate the currently needed data," Appx1350:6-10, even though frustums are not mentioned anywhere. In the course of supplementing the T_Vision Paper to "show exactly" step (b), Dr. Goodchild disregarded its full

disclosure of "calculat[ing] the currently needed data *and predict[ing] the needed data for the future flightpath,*" Appx1705 (emphasis supplied). This disclosure is facially inconsistent with step (b), which looks to the user's current field of view without predicting where the user might go next.

Contrary to what Google proposes at page 53 of its brief, ACI's expert did not find step (b) satisfied *per se* by the virtual cameras -- which, much like frustums, the T_Vision Paper does not mention -- used in Google Earth. Instead, he walked the jury through multiple source code files to explain how the process of step (b) is implemented in each accused product group. *See* Appx0640-0654. While the '550 Patent's disclosure of how fields of view are determined might not be extensive, in contrast to the T_Vision Paper, it expressly sets forth:

- a field view, limited by the two lines **17** provided in Fig. 3, 8:18-20
- location and direction of view as parameter inputs into the system, 7:59-60
- determining a field of view from those inputs, 7:59-62

To divine the same teaching from the T_Vision Paper's disclosure, Dr. Goodchild resorted to opining on what would "follow" from that disclosure. Appx1350:6. Once Dr. Goodchild got to steps (f) and (g), his testimony likewise concerned not what the T_Vision paper actually disclosed, but what it "implied." Appx1353:10. At pages 26-27 of its opening brief, ACI reviewed Dr. Goodchild's

multiple admissions that none of the text he highlighted from this paper actually disclosed what steps (f) and (g) require.

Apparently recognizing the damage its expert did to their anticipation case, Google's lawyers would now rebuild it entirely through argument, Google Br. at 54-55, none of which is persuasive. That Figure 5 of the '550 Patent discloses a box much like the one in the T_Vision Paper does not convert the latter box into a disclosure of step (f), especially in light of Google's own citation of explanatory text from the patent -- text not found in the reference -- to elucidate the criteria through which those boxes were divided. Google Br. at 54. Likewise, Google's reading of text from Appx1708 as disclosing the second of step(g)'s termination conditions is little more than wishful thinking, and in any event contradicted by its expert's admissions that these conditions are not disclosed.

## IV. OBVIOUSNESS NEED NOT BE RETRIED ON REMAND

The deficiency of Google's proof of claim 3's obviousness, in view of the T_Vision Paper and the Global Mapping patent, are adequately addressed at pages 58-59 of ACI's brief. Google's claim that obviousness must be retried if ACI prevails on anticipation, Google Br. at 38, n. 1, is not well-founded. Pages 42-43 of ACI's brief document Google's failure to make a single reference obviousness case based either on the T_Vision Paper or SRI Terravision. Google's brief offers no reply. Because Google cannot explain how a reasonable jury could have found

obviousness, this Court can and should instruct the district court to enter judgment and remove this defense entirely from this case. *See Stattec Security Corp. v. General Automotive Specialty Co., Inc*., 126 F.3d 141, 1419 (Fed. Cir. 1997).

## V. WILLFULNESS MUST BE TRIED ON REMAND

Google does not deny that when the district court granted its motion for summary judgment denying ACI enhanced damages for willful infringement, it applied the wrong legal standard, specifically the so-called objective prong of *In re Seagate Technology, LLC*, 497, F.3d 1360 (Fed. Cir. 2007) (*en banc*). "Ordinarily, when the governing legal standards change during an appeal, remand is an appropriate action." *Medgraph, Inc. v. Medtronic Corp*., App. No. 2015-2019 (Fed. Cir. Dec. 13, 2016). Google would have this Court depart from its "ordinary" practice because a Delaware jury happened to find in its favor.

That jury's noninfringement verdict, as detailed in ACI's opening brief and this one, came after Google's counsel baselessly suggested that an exceptional mode of Google Earth's operation was somehow relevant to the asserted claims. In returning its invalidity verdicts, that jury bought into (1) an incompetent obviousness defense masquerading as a "public use" defense, and (2) Dr. Goodchild's repeated and improper "supplements" of the T_Vision Paper's actual disclosure. A different jury, a jury not subjected to these distractions, could easily find that Google willfully infringed a valid patent. The district court's summary

judgment, entered under the wrong standard of willful infringement, should be vacated to allow a jury to make this determination.

Date: April 20, 2017

/s/ Scott F. Partridge
Scott F. Partridge
Baker Botts L.L.P.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of April, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of appeals for the Federal Circuit through the Court's CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Scott F. Partridge
Scott F. Partridge
Baker Botts L.L.P.

## CERTIFICATE OF COMPLIANCE

This brief complies with the limitations of Fed. R. App. P. 32(a)(7)(B). Excluding those portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), it contains 6,990 words as determined by the automated count routine of Microsoft Word. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), having been prepared in proportionally spaced typeface in 14 point Times New Roman font.

/s/ Scott F. Partidge
Scott F. Partridge